ESTATE OF E. P. LAMBERTH, DECEASED, MARY R. LAMBERTH, EXECUTRIX, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 57436, 57437, 57438.   Filed October 31, 1958.

*Richard L. Mackay, Esq.*, and *Rudolph Johnson, Esq.*, for the petitioners.

*Roy E. Graham, Esq.*, for the respondent.

TRAIN, *Judge:* Respondent determined deficiencies in the income taxes of the petitioners as follows:

---

[1] Proceedings of the following petitioners are consolidated herewith: H. D. Lewis and Mabel Lewis, Docket No. 57437; Mrs. E. P. (Mary R.) Lamberth, Docket No. 57438.

| Docket No. | Year | Deficiency |
|---|---|---|
| 57436 | 1950 | $561.94 |
|  | 1951 | 3,477.24 |
| 57437 | 1950 | 572.29 |
|  | 1951 | 5,865.25 |
| 57438 | 1950 | 561.94 |
|  | 1951 | 3,480.63 |

The issues to be decided are:

(1) Whether the sales of 26 duplexes, sold subject to existing mortgages of record by the partnership of Lewis and Lamberth in 1951, were properly reported on the installment basis, or should be determined to be reportable only on a deferred payment recovery-of-cost basis.

(2) If properly reported on the installment sales basis, in determining the amount of gain realized in 1951 on such sales, should the amounts by which each mortgage exceeded the partnership's basis in each respective duplex be included in the "initial payments" received and the "total contract prices" at which the duplexes were sold.

(3) Whether certain automobiles were used by E. P. Lamberth and H. D. Lewis in 1950 and 1951 in their trade or business, and if so, whether the depreciation claimed has been adequately proved.

(4) Whether the partnership can deduct depreciation for 1950 and 1951 on a house in Dallas, Texas, which was used by the partnership for storage purposes in those years.

(5) Whether the partnership is entitled to deduct in entertainment expenses for 1950 and 1951 greater amounts than those allowed by the respondent in his deficiency notices.

Certain other issues have been resolved by agreement of the parties and such adjustments will be given effect under the Rule 50 computation.

FINDINGS OF FACT.

Some of the facts are stipulated and are hereby found as stipulated.

E. P. Lamberth, deceased, and Mary R. Lamberth, petitioner, were husband and wife during the years involved, and filed separate income tax returns for the calendar years 1950 and 1951. Petitioners H. D. and Mabel Lewis were husband and wife during the years involved, and filed joint returns for the calendar years 1950 and 1951. The petitioners and E. P. Lamberth resided in Dallas, Texas, in 1950 and 1951. E. P. Lamberth and Mary R. Lamberth filed amended separate returns and H. D. and Mabel Lewis filed an amended joint return for the year 1951.

A partnership, which was the source of income for the petitioners herein, was owned jointly in undivided equal interests by E. P. Lamberth, deceased, sometimes hereinafter referred to as Lamberth, and H. D. Lewis, sometimes hereinafter referred to as Lewis. On the

partnership's income tax returns filed for the calendar years 1950 and 1951, it was stated that the returns were prepared on the accrual rather than on the cash basis.

All returns herein referred to were filed with the collector of internal revenue for the second district of Texas in Dallas, Texas.

### *Issues 1 and 2.*

The partnership was formed in 1945 for the purposes of constructing houses, developing land for subdivision use, and for building investment properties, such as shopping centers, duplexes, and apartment houses, in the vicinity of Dallas, Texas. During the time the partnership operated, from 1945 through the years here involved, the partnership built several thousand single residences and 200 duplexes. It constructed a number of duplexes in 1947 and 1948 which were held as rental properties.

During the year 1951, the partnership entered into contracts of sale for 26 of the duplexes. Substantially all of these duplexes had been rented by the partnership from the time of completion of construction until the dates of sale. The duplexes had been built to accommodate war and defense plant workers who were having difficulty finding adequate housing, and were intended to be an investment of the partnership. The partnership paid the cost of the duplexes partly in cash and partly by long-term financing. It obtained loans from the General American Life Insurance Company, secured by Federal Housing Authority guaranteed mortgages on the duplexes, such mortgages being evidenced by an appropriate deed of trust, which was filed for record in the deed of trust records in Dallas County, Texas. The mortgages were placed on the properties at the time of construction, and at that time and when sold, the mortgage on each duplex exceeded the cost of that particular duplex.

The sales of the 26 duplexes were handled by a real estate broker who was paid a commission of $50 to $75 for each duplex she sold. The individual duplexes were sold at sales prices ranging from approximately $15,500 to $16,900. Prospective buyers were attracted by newspaper advertisements.

Prior to the time the partnership sold the first of the 26 duplexes, it had a Dallas attorney prepare a sales contract which it could use for sale of the duplexes. These contracts were mimeographed, and all of them contained the same terms, except for slight variations in prices. A typical contract read, in pertinent part, as follows:

#### WITNESSETH:

Seller contracts and agrees to sell to purchaser, and Purchaser agrees and contracts to purchase at the price and upon the terms hereinafter set out, the

following described tract of land, together with all improvements situated thereon, situated in Dallas County, Texas and being described as follows:

Lot 24   Block 4178   City of Dallas

3424–26 Meredith

That said property is sold and will be conveyed subject to any and all restrictions of record affecting the title to said above described property.

Purchaser agrees to pay for the above described property, together with the improvements thereon situated, the sum of 15,495.43 DOLLARS, which shall be payable as follows:

The sum of 400.00 Dollars cash, the receipt of which is hereby acknowledged, and the sum of 5,700.00 Dollars payable to H. D. Lewis and E. P. Lamberth, as follows: 47.26 50.00 Dollars on the 1st day of May 1951, to be applied against principal only, the balance in monthly installments of $47.26 Dollars each, which includes interest at the rate of 6% per annum, applied first to the interest and the balance to be applied on principal, the first payment being due on or before the first day of June 1951 and continuing on the first day of each month thereafter until fully paid.

And subject to the unpaid balance due on that certain F. H. A. Promissory note for $10,400.00, dated _____ , executed by H. D. Lewis and E. P. Lamberth, payable to the order of General American Life Insurance Co., * * * said note being payable in monthly installments of $54.91 each including interest and principal, and in addition Purchaser agrees to pay monthly $\frac{1}{12}$ of the annual F. H. A. mortgage insurance according to the amortization schedule and $\frac{1}{12}$ of the estimated annual taxes and hazard insurance, which monthly payments will be well and truly made by the Purchaser on the 1st day of each month, the first payment being due and payable on the 1st day of June 1951, and a payment being due and payable on the 1st day of each succeeding month thereafter until the said note is paid in full. Privilege of prepayment of said note is to be made according to the F. H. A. prepayment plan set out in the above mentioned deed of trust.

The total amount of the payments above mentioned on this contract shall be made to Seller until the Warranty Deed is delivered, as hereinafter set out, except that on 1st day of May, 1951, Purchaser shall pay 23.59 DOLLARS to apply against principal of aforementioned F. H. A. note.

When the Purchaser herein shall have paid in full the said sum of $57, 5,700.00 to H. D. Lewis and E. P. Lamberth, together with all interest due thereon, then upon payment by the Purchaser to the Seller of all monies on deposit with the said General American Life Insurance Co. made by the Seller covering F. H. A. Mortgage insurance, taxes and hazard insurance, the said Seller agrees to convey by Warranty Deed the title to the said property, subject to the unpaid balance due at that time upon the promissory note executed by said H. D. Lewis and E. P. Lamberth, as above described.

Seller agrees to pay all taxes and assessments up to the date of the execution of this contract and thereafter all taxes and assessments shall be a part of the obligation of the Purchaser in the monthly payments as hereinabove set forth. In the event of default for 10 days of any of said payments as above set forth, or a breach of any of the terms and conditions of said contract, a registered letter of cancellation addressed to the Purchaser at his last known address shall be sufficient notice of cancellation of [sic] all interest of Purchaser in said premises shall thereupon terminate, and without notice, Seller or his representative may enter upon said premises and take possession thereof and this contract shall automatically become null and void as to any further rights of the Purchaser and to anything which might constitute a cloud upon the title to said real estate unless such default shall be waived in writing by Seller and the Seller shall in such event be entitled to:

1. Immediate possession of said real estate and if necessary to resort to legal action therefor, as if formal attorment [sic] had been established if required; and,

2. To keep and retain as liquidated damages for the failure of Purchaser to comply with the terms of this contract as well as for a reasonable and agreed compensation for the right of the use and enjoyment of said real estate for the period this contract shall be in force, the aggregate cash payments including the benefit of all amounts paid on account of taxes and assessments against the real estate, which at such time shall have been made by the Purchaser without any offset whatsoever. All improvements attached to the building are to be free and clear of all encumbrances.

    *       *       *       *       *       *       *

the right of Seller to enforce specific performance of this contract being hereby expressly reserved in full.

Subject to continuing compliance with the terms hereof, the Purchaser shall have the right to possession of said real estate and the property above set fourth, on and after May 1, 1951; the Purchaser, however, shall keep said premises in good condition, and repair at all times, and shall be solely liable for and fully indemnify and save the seller harmless from any and all personal and property damages of every nature whatsoever resulting from or in connection with said real estate; the Seller shall have the right at any time to enter upon and into the same for the purpose of inspection; the Purchaser shall not make any alterations or additions whatsoever in or to the building now on said property without the written consent and approval of the Seller. This paragraph shall be in effect until delivery of the Warranty Deed above mentioned but no longer.

It is understood and agreed that effective date of this contract shall be the first day of May, 1951, and that seller shall retain all rents paid to that day and shall make the monthly payment due on the aforementioned F. H. A. note and F. H. A. mortgage insurance, taxes and hazard insurance deposits due to that date.

    *       *       *       *       *       *       *

Should purchaser violate any of the above conditions, then at the election of the Seller, this contract may be cancelled.

The partnership's cost of the property which is the subject of the above contract was $8,517.44. The amount of the mortgage thereon was $10,400.

The partnership personnel prepared and kept in its files breakdown sheets on which were recorded their analysis of the contract terms. The sheet pertaining to the sale of 3424–26 Meredith pursuant to the contract quoted above contained the following analysis:

| | |
|---|---:|
| SALES PRICE | 15,495.43 |
| DOWN PAYMENT | 400.00 |
| Balance | 15,095.43 |
| CONTRACT PRINCIPAL | 5,700.00 |
| FHA PRINCIPAL BALANCE | 9,395.43 |
| Total | 15,095.43 |

PAYMENT DUE May 1, 1951— Apply against:

| | |
|---|---:|
| Contract Principal | $50.00 |
| FHA Principal | 23.59 |
| Total | 73.59 |

Monthly payment due June 1, 1951 and the first of each month thereafter—except that FHA Mortgage Insurance, Hazard Insurance, and Taxes vary slightly from time to time:

| | |
|---|---:|
| Principal and interest on contract | 47.26 |
| Principal and interest on FHA note | 54.91 |
| FHA Mortgage Insurance | 4.18 |
| Hazard Insurance | 4.63 |
| Taxes | 11.00 |
| Total | 121.98 |

These breakdown sheets aided the partnership in keeping account of the contract payments.

The partnership furnished those purchasers who requested it for tax purposes an analysis of the payments which the purchaser had made on the contract, categorizing the amounts paid to the partnership for F. H. A. principal, interest, insurance, and taxes in the preceding year.

The entire amounts of the monthly payments were made to the partnership which put the amounts received in its general fund. The partnership, fulfilling its own legal obligations, made the payments to the General Insurance Company from that fund. Upon execution of the sales contract, and making the downpayment, the purchasers were entitled to possession but as provided in the contracts, were not entitled to and did not receive title.

The downpayments required in the sales contract were of much smaller sums than was customary.

These sales contracts were the only documents involved in the sale transactions. No notes or other evidence of indebtedness were given to the partnership.

Two of the sales contracts were filed in the deed records of Dallas County, in the year 1951.

At least 14 of these contracts contained acknowledgment forms signed by Lamberth and Lewis before a partnership employee who was a notary public for Dallas County.

At least 14 of the sales were covered by an insurance "Sale Contract Clause," executed in the year of sale which provided that, as between the partnership and the purchaser, "any loss that may be ascertained and proven to be due the insured under this policy shall be payable to each of the parties to the contract as their interests may appear."

In 1956, the partnership sold to Mortgage Underwriting Corporation, hereinafter referred to as Underwriting, its legal title to the 26

duplexes and the sales contracts. Underwriting treated the contracts on its books as "sales contracts receivable." The contracts were not readily negotiable and could not be sold independently of the vendor's legal title to the duplexes. Attempts made by the petitioners to assign them or use them as collateral for loans were without success.

The purchasers of the duplexes were generally defense plant workers, often young couples, with very limited assets. Sometimes, the purchasers made the downpayment on the contracts in installments, and occasionally, some of them would have to have an extension of time to make the installment payments under the contract. A few of the purchasers had given checks for "rent" without having sufficient funds in the bank to cover them. At the time of making the sales, neither the broker nor the partnership demanded or obtained credit ratings from the purchasers. A purchaser's credit was considered acceptable if he had $400 or $500 for the downpayment. It was not reasonably certain in 1951 that payments on the contracts then outstanding would not be made.

Five original purchasers of five of the duplex properties here involved reconveyed by quitclaim deeds whatever interest they had in those properties to the partnership, one such reconveyance taking place in 1952, another in 1954, and three in 1955.

During the period from September 1951 through January 1955, the purchasers of 12 of the duplexes transferred their interests in their respective duplexes to third parties.

The 26 duplex units were sold in 1951 for a total selling price of $422,456.60. The selling expense in 1951 in connection with these 26 duplexes amounted to $1,178.22, and is to be added to the cost of the duplexes rather than deducted as an ordinary expense. The adjusted basis for the 26 duplexes as of the dates of sale in 1951 amounted to $199,819.56 for the buildings and $14,808.20 for the land. The cash downpayments received by Lewis and Lamberth in 1951 on these 26 duplex units in 1951 totaled $11,700. The total mortgages owed by Lewis and Lamberth on such 26 duplex units as of the various dates of sale in 1951 amounted to $255,690.52.

The petitioners reported the installment sales of these 26 duplexes on the installment basis on their 1951 partnership income tax return, showing a total realized gain of $7,972.07, of which one-half, or $3,986.04, was distributed as capital gain to the partners, each being charged with one-half thereof. Sec. 44, I. R. C. 1939. In computing the proportion of the installment payments received in the year 1951 on each sale to be included in income, the petitioners used the total sales price as "total contract price," without reducing it by the amount of the mortgage to the extent it did not exceed the partnership's basis of the property sold. The respondent, in his notices of deficiencies, recomputed the amount of gain realized in 1951 from the

installment sales by including in the "initial payments" received in 1951 the amount by which the mortgages exceeded the partnership's basis, and arrived at "total contract price" by deducting from total "selling price" the amount of the mortgages to the extent that they did not exceed such basis. Regs. 111, sec. 29.44–2. Using the resulting new ratio of gross profit to total contract price of 99.43308 per centile, the respondent determined that realized gain in 1951 was $55,004.97. In Exhibit C attached to the notices of deficiencies the respondent explained his determination of the gain from sales in 1951 as follows:

| | | |
|---|---:|---:|
| Total selling price | | $422,456.60 |
| Less selling expense | | 1,178.22 |
| | | |
| Selling price less offsets | | 421,278.38 |
| Adjusted basis: Buildings | $199,819.56 | |
| Land | 14,808.20 | |
| | | 214,627.76 |
| | | |
| Profit to be realized | | 206,650.62 |
| Initial payment: Cash downpayment | | 11,700.00 |
| Other cash payments | | 2,555.82 |
| Mortgages on property purchased subject to such mortgages | 255,690.52 | |
| Basis of said property | 214,627.76 | |
| | | |
| Excess of such mortgages over said basis | | 41,062.76 |
| | | |
| Total initial payments | | 55,318.58 |
| Contract price: Selling price | 422,456.60 | |
| Less mortgage | 255,690.52 | |
| | | 166,766.08 |
| Add excess of mortgage over basis | | 41,062.76 |
| | | |
| Total contract price | | 207,828.84 |
| Rate of profit to contract price 206,650.62/207,828.84 or 99.43308% | | |
| Gain in 1951: 99.43308% of initial payments | 55,318.58 | 55,004.97 |
| Gain per return | | 7,972.07 |
| | | |
| Adjustment | | 47,032.90 |

The purchasers, upon payments of the amounts entitling them to a conveyance of title according to the terms of the contracts, were to take the properties subject to only that portion of the mortgage debts then outstanding. The purchasers did not assume personal liability for the mortgages.

### Issue 3.

Lamberth purchased a 1948 Cadillac coupe at a cost of $4,708.70 on August 18, 1948, and owned it throughout the years 1950 and 1951.

Lewis purchased a 1949 Cadillac sedan in December 1949 at a cost of $4,807.93 and a 1950 Cadillac sedan on August 23, 1950, at a cost of $4,325. Expenses of maintenance, operation, and repair on such Cadillacs were paid by the partnership, claimed by the partnership as business expenses under "gas and oil" on the partnership tax returns for the years 1950 and 1951, and were allowed as deductions. Depreciation on the Cadillacs was not claimed on any of the partnership returns for 1950 and 1951. Lamberth and Lewis on their respective individual returns for 1950 claimed deductions of $1,074.99 and $1,-174.95, respectively, for "Auto expenses at 7 cents per mile." In their 1951 returns Lamberth and Lewis claimed deductions for "auto depreciation" of $1,008 and $1,042, respectively. These amounts claimed on their individual returns are claimed here as depreciation deductions.

Both Lamberth and Lewis owned two cars in 1950 and 1951. They each used one of their cars, their respective Cadillacs, previously mentioned, in the partnership business, checking on construction projects, land development, and overseeing rental and investment properties of the partnership. After August 23, 1950, Lewis so used his 1950 Cadillac. Neither Lewis nor Lamberth used any of the other vehicles owned or used by the partnership. Their personal cars used by them in the partnership business were not, to any appreciable extent, used by them or by other members of their families for personal purposes. Their wives used their other automobiles for family purposes.

### *Issue 4.*

On May 10, 1945, the partnership acquired, for approximately $11,-000, a tract of land consisting of 4.55 acres, hereinafter referred to as the Gilpin Property, on which was located a house designated as 314 Gilpin. The partnership acquired the Gilpin Property as investment property, with a view to utilizing it as a shopping center site. At the time of acquisition, the partners intended to remove the house eventually and then either to rent or sell the property.

The house at 314 Gilpin, hereinafter referred to as the house, was a 1½-story structure containing approximately 2,000 square feet of living area, composed of 3 bedrooms, 2 baths, a living room, a dining room, a kitchen, and a large gameroom on the second story.

The partnership rented the house after acquiring it until H. D. Lewis occupied it as his personal residence from sometime in 1947 until June 28, 1949, when he moved out. Lewis did not pay rent to the partnership for use of the house. The house was not rented again. While Lewis occupied the house in 1947, the city of Dallas had plans drawn for installation of a culvert under a street adjacent to the Gilpin Property in order to aid the development of the property as a

shopping center and subdivision contiguous thereto. While Lewis occupied the house, the partnership commenced the removing of trees and the grading, scraping, and filling of the Gilpin Property land and has continued improving the property for use as a shopping center up to the time of the hearing of this case. On December 10, 1948, the partnership applied for a change from residential to business zoning so that the shopping center might be permitted to be erected on the tract, and the zoning change was approved sometime during the middle of the year 1949.

After H. D. Lewis moved out of the house, vandals broke into the house beginning in December 1949, and for the next year and one-half broke out windows and did other considerable damage, making the house unsuitable for human habitation.

The partnership, during 1950 and 1951, had the windows boarded up and used the house for storing furniture transferred from other properties of the partnership, small tools, power equipment, and other gear belonging to the partnership. The fair market value of the house when Lewis moved out was approximately $15,000, but the house was removed from the Gilpin Property and sold for $2,000 in 1952 or 1953. The partnership claimed depreciation on the house in the amount of $450 for each of the years 1950 and 1951. The respondent disallowed the entire amounts claimed.

The house was used in a trade or business in 1950 and 1951.

## Issue 5.

The partners entertained representatives of insurance companies, mortgage bankers, lumber brokers, lumber dealers, and other suppliers of the building industry in 1950 and 1951. Most of the entertaining of these persons was done at the Cipango Club and Lakewood Country Club in Dallas, Texas. Both Lewis and Lamberth were officers and directors of the Texas Home Builders Association, and Lamberth was an officer and director of another home builders association, and both, as part of partnership activities, entertained associates of both groups in 1950 and 1951. Sometimes the partners' wives would accompany them to the clubs, and occasionally, when those being entertained brought along their families, Lewis would also bring his children along. The partners were able to identify by name some of the people they entertained, all of whom were connected with the building supply industry. Included in the entertainment expenses was $80 in each year for theater tickets, and $28.66 for liquor purchases in 1951.

In 1950 the partnership did a gross business of $293,084, and in 1951 their volume was $1,299,150. A total of $787.18 was turned into the partnership as entertainment expenses for 1950, one-third of

which was allocated by the partnership bookkeeper to personal entertainment, and two-thirds of that sum, or $524.47, was claimed on the partnership return as partnership entertainment expense. In 1951, of the sum of $2,082.88, about one-fourth was allocated by the bookkeeper to personal entertainment, and approximately three-fourths, or $1,610.82, was claimed by the partnership as entertainment expense for 1951. The allocation made by the bookkeeper was done without any authority from either of the partners, and at the trial the petitioners' motion to amend the petitions to claim the full amounts of $787.18 and $2,082.88 as entertainment expense deductions was granted. The respondent allowed one-half of the amounts claimed on the returns as partnership expenses.

The partnership incurred ordinary and necessary entertainment expenses of $400 in 1950 and $1,050 in 1951.

OPINION.

### *Issue 1.*

The petitioners admit that the partnership reported the sales in question on the installment basis. However, it is their contention that because of the poor financial position of the purchasers and the terms and nature of the contracts the partnership's rights to income under the contracts were so contingent that the partnership should not be bound by its election to report on the installment basis. Further, they contend that only the deferred payment recovery-of-cost method will properly reflect the partnership's income. See *Burnet* v. *Logan*, 283 U. S. 404 (1931); *Meyer's Estate* v. *Commissioner*, 200 F. 2d 592 (C. A. 5, 1952); *Ives Dairy, Inc.*, 65 F. 2d 135 (C. A. 5, 1933) affirming 23 B. T. A. 579 (1931); *Key Largo Shores Properties, Inc.*, 21 B. T. A. 1008 (1930).

The respondent contends that the election to report income on the installment basis is binding in the absence of a material mistake of fact unless there be such a change before the end of the taxable year in the factual situation upon which the sales transactions were based that the method is inadequate to clearly reflect income. *Pacific National Co.* v. *Welch*, 304 U. S. 191 (1938); *Saunders* v. *United States*, 101 F. 2d 133 (C. A. 5, 1939); *Derbes* v. *Commissioner*, 69 F. 2d 788 (1934), affirming 24 B. T. A. 276 (1931); *Biscayne Bay Islands Co.*, 23 B. T. A. 731 (1931); *Morgan Rundel*, 21 B. T. A. 1019 (1930).

We agree with the respondent. In *Pacific National Co.* v. *Welch*, *supra*, the taxpayer, having filed a return reporting deferred payment sales on an accrual method, sought a refund alleging that it was entitled to have the profit from the sales computed on the installment method. The Supreme Court held the election binding because the

method used in reporting the deferred payment sales clearly reflected income, even though there might have been less tax liability in the taxable year had the taxpayer reported its sales income on the installment method. The Court comments (304 U. S. at 194):

Change from one method to the other, as petitioner seeks, would require recomputation and readjustment of tax liability for subsequent years and impose burdensome uncertainties upon the administration of the revenue laws. It would operate to enlarge the statutory period for filing returns * * * to include the period allowed for recovering overpayments * * *. There is nothing to suggest that Congress intended to permit a taxpayer, after expiration of the time within which return is to be made, to have his tax liability computed and settled according to the other method. * * *

See *Daley* v. *United States*, 243 F. 2d 466, affirming 139 F. Supp. 376; *S. Nicholas Jacobs*, 21 T. C. 165 (1953), affd. 224 F. 2d 412 (C. A. 9, 1955); *Marks* v. *United States*, 98 F. 2d 564 (C. A. 2, 1938); *Sylvia S. Strauss*, 33 B. T. A. 855 (1935), affirmed per curiam 87 F. 2d 1018 (C. A. 2, 1937), and cases cited therein.

Unless the application of the installment method to the sales in question fails to clearly reflect income, the rationale of *Pacific National Co.* v. *Welch, supra*, would preclude allowing the petitioners to change to another method.

The cases relied on by the petitioners where elections were held not to be binding on the taxpayer are clearly distinguishable. In *Meyer's Estate* v. *Commissioner, supra*, not only was an election of another type involved but the Court of Appeals found that a material mistake of fact had been made. Cases similar to the instant case were distinguished on two grounds; first, that the elections there involved concerned optional methods of reporting income; and secondly, that in *Meyer's Estate, supra*, there could be no unfair burden placed on the administration of the revenue laws because the taxpayers had filed timely amended returns revoking their election.

Here, unlike the situation in *Meyer's Estate, supra*, the partnership did not file any amended returns revoking the election it made choosing one of two optional methods of reporting income. Further, petitioners have not proven that they made any material mistake of fact. They have alleged, but have failed to prove, that the purchasers were financially irresponsible; it has been shown only that many of the purchasers had limited assets, a fact known to the petitioners at the time of contracting.

In *Key Largo Shores Properties, Inc., supra*, facts arising before the end of the year made it clear that the installment method would not clearly reflect income; a second mortgage included in the contract price was of no value. The land itself was of insufficient value to afford any security for the debt covered by the second mortgage and it was reasonably certain that the purchaser would make no further payments

on the debt. For the same reasons *Ives Dairy, Inc., supra,* is clearly distinguishable. In the instant case, while there have been some reconveyances to the partnership by the purchasers, all such transactions took place after the close of the taxable year. There have also been some conveyances to third parties, but it was not reasonably certain in 1951 that the purchasers or other assignees would not continue to make payments. There is no evidence that the properties were not sufficient securities for the debts, under the terms of the contracts. The factual situation is more like that in *Morgan Rundel, supra,* and *Biscayne Bay Islands Co., supra,* where the taxpayers having reported the sales on the installment basis were not allowed to change to the deferred payment recovery-of-cost basis.

For the purposes of the installment method the contract transactions in 1951 constituted installment sales.[2] It is unnecessary for application of the installment method that the seller receive any obligations having a fair market value for they are not to be taken into income. The petitioners' contention that the sales contracts were not marketable does not aid them here. *Biscayne Bay Islands Co., supra; Derbes, supra.* As previously pointed out, it has not been shown that the partnership's contract rights were worthless in the year 1951.

The petitioners contend that their books and records, which are consistent with the method used in reporting these sales, do not clearly reflect income because of the facts surrounding the sales transactions. They allege that the only method which will properly reflect income is one which allows them first to recover their entire basis before any of the amounts realized are taxable as gain. But, as indicated above, we are satisfied that, independently of any reliance on such books and records, their contention is not supported by the facts.

While the petitioners have also made an error in their computation of gain to be reported (discussed under Issue 2), such a mistake of law does not free them from their election. *Sylvia S. Strauss, supra.*

The installment method properly applied will clearly reflect the income from the sales here involved. The partnership is bound by its election to report the sales on the installment basis.

### *Issue 2.*

A seller of real property reporting on the installment basis may return as income from the sale the proportion of the installment payments actually received in that year which the gross profit on the sale bears to the total contract price. Sec. 44, I. R. C. 1939.[3]

---

[2] Regs. 111, sec. 29.44-2. SALE OF REAL PROPERTY INVOLVING DEFERRED PAYMENTS.— Under section 44 deferred-payment sales of real property include (a) agreements of purchase and sale which contemplate that a conveyance is not to be made at the outset, but only after all or a substantial portion of the selling price has been paid, * * *

[3] SEC. 44. INSTALLMENT BASIS.

(a) DEALERS IN PERSONAL PROPERTY.—Under regulations prescribed by the Commis-

Relying on the statute and on Regulations 111, section 29.44–2,[4] the respondent included in "initial payments" the amounts by which the mortgages exceeded the partnership's bases in the properties sold. The respondent eliminated from the total selling prices the amounts of the mortgages to the extent that they did not exceed the partnership's bases in the properties sold, and included only such excess to arrive at the "total contract price." The purchasers did not assume the mortgages, but it is the respondent's position that the properties were sold subject to the entire amounts of the mortgages.

The petitioners contend that the properties were not sold "subject to the mortgage" as that phrase is customarily used nor subject to any portion of the mortgages and, therefore, that the amount by which the mortgages exceeded bases should not be included in the initial payments, and that the total contract prices should not be reduced by any amount of the mortgages.

We do not agree entirely with either party's position. The purpose of the regulation was to make it possible to tax the entire profit during the period the purchase moneys were being received where a sale was reported on the installment basis, and the purchaser either assumed the mortgage or took subject to it. It was not intended to apply to every sale of mortgaged property but only to those situations where only part of the total selling price would be paid directly to the seller by the purchaser, the remaining part being paid by the buyer directly to the mortgagee. *Burnet* v. *S. & L. Bldg. Corp.*, 288 U. S. 406 (1933), and *Stonecrest Corporation*, 24 T. C. 659 (1955).

According to the terms of the typical contract transaction stated in our findings and hereinafter used for purposes of illustration, the amount of the total selling price, $15,495.43, was to be paid by the purchaser in the following manner. After the initial payment of $400, the purchaser was to pay $5,700 to the partnership by making

sioner with the approval of the Secretary, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit realized or to be realized when payment is completed, bears to the total contract price.

(b) SALES OF REALTY AND CASUAL SALES OF PERSONALTY.—In the case * * * of a sale or other disposition of real property, if * * * the initial payments do not exceed 30 per centum of the selling price * * *, the income may, under regulations prescribed by the Commissioner with the approval of the Secretary, be returned on the basis and in the manner above prescribed in this section. As used in this section the term "initial payments" means the payments received in cash or property other than evidences of indebtedness of the purchaser during the taxable period in which the sale or other disposition is made.

[4] Regs. 111, sec. 29.44–2. SALE OF REAL PROPERTY INVOLVING DEFERRED PAYMENTS.—* * *

* * * * * * *

In the sale of mortgaged property the amount of the mortgage, whether the property is merely taken subject to the mortgage or whether the mortgage is assumed by the purchaser, shall be included as a part of the "selling price," but the amount of the mortgage, to the extent it does not exceed the basis to the vendor of the property sold, shall not be considered as a part of the "initial payments" or of the "total contract price," as those terms are used in section 44, in sections 29.44–1 and 29.44–3, and in this section. * * *

a payment of $50 on May 1, 1951, and monthly payments of $47.26 which payments included interest at 6 per cent per annum. Thus, the $5,700, excluding any additions for interest, would be paid to the partnership over a period of approximately 10 years. Only after that amount had been paid was the partnership, according to the sixth paragraph of the contract, to convey title to the purchaser. While the contract does not clearly state that the monthly payments of $54.91 due on the mortgage debt were to be paid by the purchaser, the amount of the monthly payments, as stated on the breakdown sheet in our findings, indicates that these payments were to be made by the purchaser concurrently with the payments of $47.26 to be applied against the sum of $5,700. By monthly payments of $54.91, a substantial portion of the mortgage debt would be paid in approximately 10 years. However, it would take approximately another 4 years of monthly payments of $54.91 to pay the mortgage debt in full. It follows that the conveyance to be made according to the sixth paragraph of the contract would be of a warranty deed, as the contract itself states, "subject to the unpaid balance due at that time upon the promissory note."

Thus, at the end of the 10-year period, herein referred to as the "contract period," the mortgage debt would continue in existence for approximately another 4 years, unless prepaid. However, at the end of the contract period, the purchaser would have received title, and presumably would make further payments on the mortgage debt directly to the mortgagee.[5] The purchaser would take the property subject only to the amount of the mortgage debt outstanding at the end of the contract period.

The petitioners' contentions on brief that the conveyance will be made free and clear of any debts and that the entire amount of the purchase price will be paid directly to the partnership during the contract period are, as shown above, not sustained by the facts. To the extent of the mortgage debt which would be outstanding at the time conveyance was to be made and, presumably, when direct payments to the partnership would terminate, the properties were to be taken subject to the mortgage. Conversely, the property was not to be conveyed subject to that part of the mortgage debt which would be paid by the purchaser directly to the partnership during the contract period, and the respondent erred in reducing the "total selling price" by the entire amount of the mortgage to arrive at "total contract price."

The petitioners rely upon *Stonecrest Corporation, supra.* There we did not find that the selling price to be paid to the seller was reduced

---

[5] In the fifth paragraph of the contract set forth in the findings it is provided: "The total amounts of the payments above mentioned on this contract shall be made to Seller until the Warranty Deed is delivered."

by any amount of the mortgage. In that case it seemed clear "that the seller was intended to pay the [entire] mortgage debt out of the proceeds of the sale."

The petitioners contend that that part of the regulation stating "the property is merely taken subject to the mortgage" is properly applicable only where title has been conveyed, and that title has not been conveyed here. Thus, it would follow from their interpretation of the regulation that a vendor selling two mortgaged properties on the installment method would receive different tax treatment on those two sales under section 44 if the terms of the sales were precisely the same, except that title was to be conveyed in the year of contracting in one instance and not in the other. However, a sale may qualify for section 44 treatment whether or not title has passed and it is certain that the same rules were to apply to all installment sales. For the application of the statute and the regulation, as we have applied it here, it is sufficient if the property is to be taken "subject to" the mortgage or any part thereof when conveyance is to be made according to the terms of the contract.

The method of reporting income on the installment basis which was employed by the partnership would frustrate the very purpose of the regulation, for that amount of the total selling price, here the amount of the mortgage debt outstanding at the end of the contract period, which may be paid directly by the purchaser to the mortgagee, would not necessarily be taxed during the time that the partnership was receiving direct payments from the purchaser but only as the mortgage debt became due and was paid. *Stonecrest Corporation, supra.* From an administrative viewpoint this would be unsatisfactory. For example, the profit to be realized on the transaction stated in our findings would be approximately $6,978. By the method of reporting used by the partnership, approximately $1,200 of profit on this particular sale would not be reported as income during the contract period, but would be reported only after direct payments to the partnership had terminated. As the purchaser would make the remaining payments due on the mortgage debt, Lewis and Lamberth, as principal debtors, would be realizing income, but the payments would not be readily traceable to their benefit. As the Supreme Court stated in *Burnet* v. *S. & L. Bldg. Corp., supra:*

The method suggested by [the taxpayer] would inevitably lead to many practical difficulties, might postpone collection far beyond the time when the vendor would receive any direct payments; and probably would render impossible determination from the taxpayer's books of what he should account for.

The respondent's method would cause difficulties of another sort. Applying his method to our typical transaction, the amount of the mortgage, $10,400, in excess of cost, $8,517,[6] or $1,883, would be in-

---

[6] Figures are rounded off to the nearest dollar.

cluded in the initial payment. The total selling price of $15,495 would be reduced by the amount of the mortgage not in excess of cost, or by $8,517, to arrive at a total contract price of $6,978, which sum is, of course, equal to the gross profit. Therefore, applying the rule of section 44, since the ratio of gross profit to total contract price would be 1 to 1, the entire amounts of the initial payments and subsequent payments would be taxed until they totaled $6,978. By this method the gross profit on the sale would be taxed in approximately the first 5 years, although payments to the partnership would continue for another 5 years. However, it was the purpose of section 44 that a constant proportion, determined by a fixed ratio of gross profit to total contract price, of each installment payment be returned as income. It was not intended that the first payments be taxed completely to the extent of gain and that the latter payments represent recovery of cost and be tax free. Further, the respondent's method, if applied here, would do violence to his regulation as interpreted in *Stonecrest Corporation*, *supra*. In that case it was emphasized that property is taken subject to a mortgage within the meaning of the regulation only where the payments on the mortgage are to be made to the mortgagee and not to the seller, here true only to the extent of the mortgage debt outstanding at the time conveyance was to be made. Therefore, the total selling price should be reduced only by that amount of the mortgage debt to arrive at total contract price. In this manner that part of the outstanding mortgage debt which represents gain will be taxed over the entire contract period.

We hold that the respondent should have eliminated from the total selling prices only the amounts of the mortgage debts which would not be paid during the contract periods and before titles were to be conveyed to arrive at the total contract prices.

Since, under the present holding the ratio of gross profit to total contract price could vary from contract to contract and will not be 1 to 1, the computations shall be made on each contract individually as the petitioners suggest and not in the aggregate as the respondent has done.

### Issue 3.

The respondent contends that even if the automobiles were used in the trade or business, the petitioners are not entitled to depreciation deductions because they failed to prove the useful lives and the salvage values of the automobiles. However, the petitioners are entitled to some deduction even though the amount thereof must be an estimate. *Walter M. Joyce*, 25 T. C. 13 (1955); *Cohan* v. *Commissioner*, 39 F. 2d 540 (1930).

We do not agree with the respondent's contention that the automobile expenses taken by the partnership include a reasonable allowance for depreciation. The amounts claimed by the partnership for

automobile expenses seem to be reasonable amounts for gas and oil and maintenance; in this respect the situation is factually unlike that in *Walter I. Geer*, 28 T. C. 994 (1957).

While we are satisfied that the automobiles were used principally in the trade or business and only incidentally, if at all, for personal purposes, the amounts claimed by the petitioners are too high. A reasonable annual allowance for depreciation for Lamberth's 1948 Cadillac is $700, for Lewis's 1949 Cadillac, $720, and for his 1950 Cadillac, $650.

*Issue 4.*

The petitioners contend that the house was used in the petitioners' trade or business, first for rental purposes and then, after Lewis moved out, for the storage of partnership equipment and furniture.

The respondent contends that none of the $11,000 basis is allocable to the house because it was the petitioners' intention at the time of purchase to have the house eventually removed from the premises and to develop the property as a shopping center site. *Lynchburg National Bank & Trust Co.*, 20 T. C. 670 (1953); *Providence Journal Co. v. Broderick*, 104 F. 2d 614 (C. A. 1, 1939).

We agree with the petitioners. The cases relied upon by the respondent are distinguishable. In those cases there was a definite intention at the time of purchase to demolish the buildings. Here there was no such intent; the petitioners intended to rent the house until its removal and then either to rent or sell it. There is no evidence of any intent to demolish the house; therefore, some portion of the $11,000 basis is allocable to the house.

While Lewis's occupancy was a personal use of the house, the partnership used it for storage purposes some time after he moved out and during the years in question. However, to what extent the house was so used is not certain, though it is known that furniture and equipment were stored in the house. While the question is not free from doubt, we are satisfied that a substantial part of the house was used in the partnership's trade or business for storage purposes during the years involved.

The petitioners have failed to show the fair market value of the house as compared to the land at the time of acquisition which would have indicated what portion of the $11,000 basis should be allocated to the house. Nor is it known whether or not any depreciation on the house was deducted prior to the years in question. The fair market value of the house when Lewis moved out was $15,000, but at the time the partnership began to use the house for storage some damage from vandalism had already been done, and in 1952 or 1953, the house was presumably worth only $2,000, the amount for which it was sold. The principle of the *Cohan* case, *supra*, is applicable; the partnership is entitled to some deduction for depreciation. However, petitioners

must bear the burden of failing to be more explicit in their proof. We find that $100 annually is a reasonable allowance for depreciation.

*Issue 5.*

The respondent disallowed one-half of the entertainment expenses claimed. The petitioners proved that the bookkeeper made the allocation between personal and partnership entertainment expenses without authority from either of the partners. Having considered all the testimony and the volume of business done by the partnership, we are satisfied that the partnership incurred ordinary and necessary entertainment expenses of $400 in 1950 and $1,050 in 1951 and we so hold.

*Decisions will be entered under Rule 50.*