AUGUST C. MEYER, JR. and KAREN H. MEYER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Meyer v. Commissioner
Docket No. 36700-84.
United States Tax Court
T.C. Memo 1987-357; 1987 Tax Ct. Memo LEXIS 357; 53 T.C.M. (CCH) 1399; T.C.M. (RIA) 87357; July 22, 1987. *357 Ps had in several farms -- in one as the owner and in several as a partner. The farms were located on real estate which had been improved by the installation of subsurface drainage systems. Ps claimed depreciation deductions for each such drainage system and an investment tax credit for one of the systems based upon allocating to the drainage system a part of the purchase price for each farm. Held, amounts allocable to subsurface drainage systems determined. Francis J. Jahn and Tracy J. Nugent, for the petitioners. Brett J. Miller, for the respondent. MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined a deficiency of $ 44,405 in the petitioners' Federal income tax for 1980. After concessions by the parties, the only issue for decision is whether the petitioners are entitled to a deduction for depreciation for water drainage systems located beneath the surface of farms purchased by the petitioners individually and as members of a partnership and an investment tax credit for such systems on a farm purchased by the petitioners individually. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, August *358 C. Meyer, Jr., and Karen H. Meyer, husband and wife, maintained their legal residence in Champaign, Illinois, at the time they filed their petition in this case. They filed their joint Federal income tax return for 1980 with the Internal Revenue Service Center at Kansas City, Missouri. Mr. Meyer, E. Lindell Huisinga, and George T. Timmons formed a partnership known as Mackinaw Farms (the partnership) to own, manage, and operate real estate, and to engage in related activities. The partnership was the beneficiary of 2 land trusts, consisting of 25 farms. The such farms, six were acquired in 1974, five were acquired in 1977, one was acquired in 1978, six were acquired in 1979, and seven were acquired in 1980. Messrs. Huisinga and Timmons each contributed 50 percent of the beneficial interest in the land trusts to the partnership. Mr. Meyer contributed cash and a promissory note to the partnership. In addition, the petitioners purchased individually a farm, known as Wisegarver Farm, in 1980. Each of these 26 farms was acquired through a lump-sum purchase or a like-kind exchange. During the year at issue, Mr. Meyer was a partner in the partnership. The 26 farms cover 5,153 acres *359 of fertile land in the diverse agricultural area of the Illinois counties of DeWitt, Ford, and Piatt, within approximately 100 miles of Champaign, Illinois. During 1980, such farms were utilized for production of corn and soybeans. The soil on the farms naturally drains water poorly. In fact, over 100 years ago, the land on which the farms are located was swamplike. Such land was made productive farmland partly by means of subsurface drainage systems. A subsurface drainage system utilizes drain tiles, made of clay, concrete, or plastic tubing, which are installed below ground level. The drain tiles, which create underground passages for the flow of water, are installed by digging a trench, laying the tile in such trench, and backfilling the trench. Excess water from the ground is captured in a relatively small drain, called a lateral, and the water from several laterals is deposited into a larger drain, either a "main" or a "submain," and is eventually carried into a surface waterway. Laterals may be as small as 2 inches in diameter, and mains may be as large as 30 inches in diameter. There are four basic patterns used in subsurface drainage systems. In the random pattern, *360 laterals are arranged according to the location and size of isolated wet areas. The parallel pattern consists of parallel laterals located perpendicular to the main and is used in flat fields which have uniform soil. The herringbone pattern consists of parallel laterals that enter the main at an angle other than 90 degrees, usually from both sides, and is often combined with other patterns to drain small or irregular areas. The double main pattern is used where a substantial depression, frequently a surface waterway, divides the field in which subsurface drains are installed. Such pattern consists of a main on each side of the depression with laterals, in parallel or herringbone pattern, feeding into the main from only the side away from the depression. The subsurface drainage systems on the 26 farms at issue were installed over a period of 100 years; over the course of a century, old systems were extended and repaired, and new systems were added. As a consequence, each farm contains several of the four basic drainage systems, and the various systems, as well as the tiles within a system, are of varying ages. There was no documentation concerning the location and specifications *361 of some of the drainage systems, and much of the documentation that did exist has been lost over the years as the farms changed ownership. On their income tax return for 1980, the petitioners claimed their distributive share of a net loss from the partnership and a net loss from operation of the Wisegarver Farm. On such return, the petitioners allocated $ 79,200 of the $ 763,930 purchase price of the Wisegarver Farm as the cost basis of subsurface drain tile. They claimed an investment tax credit on such amount and depreciated the tile using a 20-year useful life. They computed the cost basis of the tile by using $ 400.00 per acre as the reasonable cost of the tile, which was 10.37 percent of the purchase price. The partnership losses included claims for depreciation on subsurface drainage systems. The allocations of purchase cost to the subsurface drainage systems by the partnership were, on average, $ 119.85 per acre for the farms acquired in 1974, $269.00 per acre for the farms acquired in 1978, $ 327.22 per acre for the farms acquired in 1979, and $ 244.48 per acre for the farms acquired in 1980. Such allocations of the partnership were made on a flat per-acre basis. The petitioners *362 did not obtain an independent formal appraisal to determine the relative values of the farm land and the subsurface drainage systems in existence on the date of acquisition of any of the 26 farms at issue or the absolute value of such systems. In addition, no such values appear on any document incident to or memorializing the acquisition of any of the farms. None of the costs of the subsurface drainage systems claimed by the petitioners or the partnership were based on expenditures by them for the construction, modification, or repair of such systems. In his notice of deficiency, the Commissioner disallowed, among other things, all depreciation deductions and the investment tax credit relating to subsurface drainage systems on the farms. He explained that these adjustments were made because it had not been determined that there was any drain tile on the farms and that the basis of any such tile had not been determined. OPINION The only issue for decision is whether the petitioners are entitled to a deduction for depreciation for the subsurface drainage systems on the 26 farms at issue and an investment tax credit for such system on the Wisegarver farm. The petitioners bear the burden *363 of proving that the Commissioner's determinations in the notice of deficiency are incorrect. Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering,290 U.S. 111 (1933). Specifically, the petitioners must show that the deductions and credits claimed by them satisfy the requirements of the appropriate statutory provisions. See Deputy v. duPont,308 U.S. 488, 493 (1940); New Colonial Ice Co. v. Helvering,292 U.S. 435, 440 (1934). Section 48(a) of the Internal Revenue Code of 1954, as in effect in 1980, [1] limits the availability of the investment tax credit under section 38 to "property with respect to which depreciation * * * is allowable and having a useful life * * * of 3 year or more." [2] *364 The parties have stipulated that the useful life of any drain tile determined to be in existence is greater than 3 years. Therefore, the only question remaining concerning the investment tax credit is whether the drain tile was depreciable property. [3]
Section 167(a) provides that there shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in trade or business or of property held by a taxpayer for the production of income. The regulations provide that the amount deducted each taxable year should be pursuant to a reasonably consistent plan so that the aggregate of the amounts deducted, plus the salvage value, will equal the cost or basis of the depreciated property at the end of its estimated useful life. Sec. 1.167(a)-1, Income Tax Regs.
If depreciable and nondepreciable property, such as improved real estate, are bought for a lump sum, the purchase price must be allocated between the land (nondepreciable property) and the improvement (depreciable property). Sec. 1.167(a)-5, Income Tax Regs.; see Canelo v. Commissioner,53 T.C. 217 (1969), affd. per curiam 447 F.2d 484 (9th Cir. 1971). The part of the total cost that is allocated *365 to the depreciable property (which forms its original basis for depreciation) cannot exceed an amount that bears the same ratio to the purchase price as the value of the depreciable property at the time of acquisition bears to the value of the entire property at that time. Sec. 1.167(a)-5, Income Tax Regs.; see Maloney v. Commissioner,T.C. Memo. 1975-286, affd. 566 F.2d 1054 (6th Cir. 1977). The Commissioner contends that the cost basis of the subsurface drainage systems relied upon by the petitioners did not prove the existence of the subsurface drainage systems and that, even if the systems do exist, the petitioners have failed to show their value. He also points out that the petitioners arbitrarily allocated parts of the cost of the farms and that they made no attempt through the use of experts or otherwise to secure information concerning the extent and value of the subsurface drainage system on each farm. The petitioners contend that they are not required to show with certainty the exact number of feet and size of the tile in order to justify their allocation of the cost of drain tile for purposes of computing depreciation and investment tax credit. They maintain that they *366 have carried their burden of proving the existence of the subsurface drainage systems by the expert testimony presented by them showing that subsurface drainage systems were actually operating on some of the farms and by the evidence showing that the land could not be successfully farmed without adequate subsurface drainage systems. There is documentary evidence supporting the petitioners' contention that large and effective subsurface drainage systems are still functioning under the farms. Numerous drain tile maps dating from the 1880s were admitted into evidence. In some instances, such maps had been updated to reflect repairs and added drain lines. Such maps indicated that 711,289 lineal feet of tile, ranging from 2 inches to 18 inches in diameter, had been installed on the 10 farms in Ford County. In addition, aerial photographs of two of the farms were admitted, and there was testimony which demonstrated that subsurface drainage systems had been installed on such farms as indicated on the tile maps. Tile maps for several farms in Piatt and DeWitt Counties were also admitted. Finally, the Illinois Drainage Guide, which witnesses for each party recognized as a reliable authority, *367 stated that the most poorly draining predominant soil type on any of the farms required subsurface drainage lines 80 to 90 feet apart, and the best draining soil required lines 100 to 120 feet apart. There was also expert testimony which supported the petitioners' position and which described the difficulty in substantiating such position. Stanley L. Seevers, a subsurface drainage contractor who had over 10 years' experience and who had installed approximately 700 miles of drain tile, stated that, while laying new drain tile on some of the farms, he came across 90-year-old tile which was functioning properly. In addition, he testified that it is practically impossible to locate and determine the size and length of all the drain tile on the farms. Furthermore, in a written report, Mr. Seevers reviewed four methods which might provide the desired information and determine that no such method was completely satisfactory. He stated that aerial infrared photography was unreliable and that any subsurface tile lines identified could only represent a minimum of the tile installed. He asserted that low level aerial photography could show where the soil had been disturbed when tile was installed. *368 However, neither method of photography could show the size of the tile. Mr. Seevers rejected physically probing each field as too costly. Finally, measuring the outflow of the main drainage tiles could provide an estimate of the number of feet of tile of various sizes necessary to produce such outflow. No explanation was provided for not employing this method. Nevertheless, he did form an opinion as to the existence of subsurface drainage systems; he said: Finally, I have reviewed information on the topography, soil types, surface drainage, and crop yields on these farms [the farms in DeWitt and Piatt Counties], and based upon this information and upon my personal knowledge of these farms, I can state that I believe each of these farms is a well-drained farm. At trial, Mr. Huisinga, a partner in the partnership, testified that he personally inspected each of the farms at issue before it was purchased. In his opinion, the farms were each well drained. In addition, he testified that the crop yields on the farms were extremely good when compared to the appropriate county average. Jesse M. Dowell, a professional farm manager with a master's degree in agri-economics farm management *369 who managed 9 of the farms at issue from 1957 through 1977, stated that 10 farms at issue that were located in Ford County were "well-drained farms." Witnesses for the Commissioner and the petitioners testified that from time to time certain lines in the drainage systems ceased to function. However, the consensus among such witnesses was that with minor repairs the drainage systems functioned properly. Robert H. Maehle, a witness for the Commissioner, stated that some of the older drainage lines were shallow and partially filled with sediment, both of which decreased the efficiency of the tile, but that generally they were working. Finally, it is clear that, without effective subsurface drainage systems, the land in question would not be suitable for farming. Based on the record as a whole, we conclude that all of the farms at issue had subsurface drainage systems which were effective in draining such farms. Therefore, we need only determine the value of such systems to reach a decision in this case. Concerning valuation, the parties have stipulated that the proper method for assessing the cost basis for the drainage systems, for purposes of depreciation and investment tax credit, *370 is to determine replacement cost on the date of acquisition and to discount such cost by an amount representing reasonable physical deterioration and obsolescence. We observe that in theory such method is correct; however, the facts that subsurface drainage systems are effectively inaccessible to an appraiser and that changes in ownership have resulted in poor records make it extremely difficult to ascertain the appropriate discount for deterioration and obsolescence. In general, the basis of the partnership in the property contributed to it by a partner is the same as the adjusted basis of the contributing partner at the time of contribution. Sec. 723. In the absence of an adjustment to basis, a taxpayer's adjusted basis is generally equal to his cost. Secs. 1011, 1012. Therefore, we must determine the proper cost basis of the systems at the the farms were acquired by the partners. In his report, Mr. Seevers states that the cost per acre of a subsurface drainage system sufficient to adequately drain a farm was between $ 315 and $ 455 in 1977, $ 345 and $ 495 in 1978, $ 380 and $ 545 in 1979, and $ 400 and $ 575 in 1980. J. Lloyd Brown, a real estate appraiser in the counties *371 in which the farms are located, stated that from 1977 to 1980, well drained land was worth up to $ 500 to $ 600 more per acre than undrained land. The Commissioner provided no credible evidence to the contrary. Therefore, we accept Mr. Seever's information and concluded that the per-acre replacement cost of the drainage systems on the farms was $ 385.00 for farms acquired in 1977, $ 420.00 for farms acquired in 1978, $ 462.50 for farms acquired in 1979, and $ 487.50 for farms acquired in 1980. The average cost of subsurface drainage systems reported by the partnership for 1977 was $ 269.00 per acre. Such cost per acre was 70 percent of the replacement cost per acre in 1977. The average cost reported for 1979 was $ 327.22 per acre, which was 71 percent of the 1979 replacement cost per acre. For 1980, the average cost of drain tile reported for the partnership's farms was $ 244.48 per acre, which was 50 percent of the 1980 replacement cost per acre. These reported costs provided a reduction to the replacement cost of the drainage systems to reflect physical deterioration and obsolescence of 30 percent in 1977, 29 percent in 1979, and 50 percent in 1980. In addition, such reported *372 costs were all significantly below the value that the drainage systems added to the land. We conclude that these costs are appropriate; they reasonably balance the varying ages of the tiles and the existence of sediment with the fact that the drainage systems were effective. The average cost of subsurface drain tile reported by the partnership for 1978 was $ 400 per acre, which was 95 percent of the 1978 replacement cost. For 1980, the petitioners reported an average cost of $ 400 per acre for tile on the Wisegarver Farm. Such costs was 82 percent of the 1980 replacement cost. We conclude that in both years, the cost allocation does not adequately reflect the physical deterioration and obsolescence of older tiles and that the proper cost basis is 63 percent of the replacement cost for each relevant year. This percentage allows a 37-percent discount for physical deterioration and obsolescence, which is weighted average of the amounts provided by the partnership's cost figures for 1977, 1979, and 1980. For 1974, the reported average cost of subsurface drain tile was $ 119.85 per acre. The parties provided no estimate of the replacement cost of tile for 1974. However, given our findings *373 of the existence and efficiency of subsurface drainage systems, the partnership is entitled to some deduction for depreciation. Estate of Lamberth v. Commissioner,31 T.C. 302, 319 (1958), applying Cohan v. Commissioner,39 F.2d 540 (1930). We observe that $ 119.85 is 45 percent of the cost per acre that we found appropriate for 1977. Based on the relatively low cost reported for 1974, when compared to the cost allowed just 3 years later, we conclude that the cost basis reported for 1974 is appropriate. Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect in 1980, unless otherwise indicated. ↩
2. The regular investment tax credit has been generally repealed for property placed in service after Dec. 31, 1985. Sec. 49(a), I.R.C. 1986↩. 3. We observe that the Commissioner did not raise the issue of whether the drain tile was "other tangible property" within the meaning of sec. 48(a)(1)(B)↩, and we express no opinion on that issue.