**MARKS v. UNITED STATES.**

**No. 271.**

Circuit Court of Appeals, Second Circuit.

July 18, 1938.

Smyth & Smyth, Jr., and Melvyn Gordon Lowenstein, all of New York City (Herbert C. Smyth, Jr., and George Natanson, both of New York City, of counsel), for appellant.

Lamar Hardy, U. S. Atty., of New York City (Clarence W. Roberts, Asst. U. S. Atty., of New York City, of counsel), for the United States.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The first cause of action, which alone concerns this appeal, is brought by a taxpayer to recover $9,298.41, with interest from December 15, 1930, being a portion of the tax paid on his 1929 income that is alleged to have been "illegally and wrongfully assessed and collected." The only item of income involved is that arising from a sale by the taxpayer in March, 1929, to Alfred Blumenthal of one-fourth of an additional membership in the New York Stock Exchange for the sum of $120,000, of which $100,080 is claimed to have been net profit for that year. The final payment on the 1929 income tax was made on December 15, 1930.

The taxpayer was a member of the New York Stock Exchange. On February 28, 1929, he entered into an agreement with Blumenthal for the sale of the one-fourth membership. Under the rules of the Exchange it was necessary that Blumenthal's membership be listed as fully paid. The transfer took place about March 22, 1929, and, to conform to the rules, the taxpayer issued his own certified check to Blumenthal for $120,000, the face amount of the purchase price, in return for which the latter gave his check to the taxpayer for the same amount. This complied with the rules and established the price of membership. The financial transactions, however, represented no more than an exchange of checks out of which the taxpayer who sold the seat realized nothing. The terms of sale were governed by a socalled subordination agreement which in effect created a purchase money mortgage in which the rights of the mortgagee were subordinated to Stock Exchange creditors. By it Blumenthal promised, subject to its terms, to repay the $120,000 "from time to time, with interest thereon, or on any unpaid balance thereof, at the rate of six per cent from the date hereof, and, in any event, thirty days after the applicant ceases to be a member of the said Exchange and all claims entitled to priority in payment, as herein provided, have been paid in full."

The taxpayer, described as the "lender", agreed with Blumenthal, described as the "applicant", that the lender's right to repayment of the loan "is subordinated to the payment in full of all claims against the applicant, or against any partnership registered on the New York Stock Exchange of which he may be a member, arising out of business transacted by him or by such partnership while he is a member of the New York Stock Exchange, and that in any proceeding involving the application of the assets of the applicant, or of such partnership, to the payment of his or its debts, the claims aforesaid shall be fully paid before the lender shall have a right to any payment on account of the said sum loaned as aforesaid, and that as long as the applicant is a member of the New York Stock Exchange and until all such claims are fully paid, the lender will not institute or maintain any suit or proceeding for the recovery of the said sum loaned as aforesaid or any part thereof."

The subordination agreement also provided that: "Nothing herein contained shall prevent the lender from accepting and retaining voluntary payments made by the applicant or by the partnership of which he may be a member on account of the sum loaned * * *, or as interest thereon, so long as the applicant and any such partnership are solvent and such payments do not impair the ability of the applicant or of such partnership to pay in full the claims entitled to priority in payment as hereinbefore provided."

In the year 1929 Blumenthal paid $45,000 on account of the purchase price of the seat and in 1930 paid the balance of $75,000. In the latter year the taxpayer's return showed a net loss of approximately $106,000 without taking into account any part of the item of $75,000, so that even if the $75,000 were wholly gain there would have

been no tax if it was properly assessable only as 1930 income.

The taxpayer filed an income tax return for 1929 and paid a capital gain tax of $12,510 on the difference between the cost, or the value as of March 1, 1913, whichever was greater, of a one-fourth additional membership in the New York Stock Exchange and the price at which it was sold to Blumenthal. The return set forth the property on which the gain was calculated as a "sale of right to membership in N. Y. Stock Exchange". It stated that the property acquired in April, 1922, was sold in March, 1929, that the amount received on the sale was $120,000, that the cost or value as of March 1, 1913, whichever was greater, was $19,920, that the net gain was $100,080, and the tax at 12½% was $12,510.

On June 10, 1932, the taxpayer filed a claim for refund of the tax paid on his 1929 income in which he dealt with the sale on an instalment basis, calculated the gain as $37,530, instead of $100,080, and computed the tax at 12½% as $4,691.25. He stated his claim for a refund as follows:

"In March 1929 the taxpayer sold his right to one-fourth of an additional membership in the New York Stock Exchange for $120,000 reporting a capital gain of $100,080 on the transaction. The taxpayer received only $45,000 in cash during 1929, the balance of $75,000 being represented by a note of the purchaser.

"According to section 44 (b) of the Revenue Act of 1928, if (sic) in the case of a casual sale of personal property * * * for a price exceeding $1,000 where the initial payments do not exceed forty per centum of the selling price, the income may be returned on the installment basis. This basis permits the vendor to return as income that proportion of the installment payments actually received in the taxable year which the total profit realized or to be realized when the property is paid for bears to the total contract price.

"In view of the foregoing it is submitted that the taxpayer should have reported in 1929 the amount of $37,530 and not $100,080 as capital gain on the sale of his right to one-fourth of an additional membership in the N. Y. Stock Exchange."

On May 16, 1933, after the time to file refunding claims for the tax on his 1929 income had expired, the taxpayer filed an amended claim in which he asked to have the tax paid on the gain realized from the sale calculated on the instalment basis set forth in the original claim, stating, however, that the balance of $75,000 unpaid in 1929 was represented by the subordination agreement instead of by "a note of the purchaser". But he added the following as a new ground of recovery:

"However, if it should be determined that the taxpayer may not report the profit realized by him on the sale of the right to one-fourth of an additional membership in the New York Stock Exchange, on the installment sales basis as set forth above, then it is claimed that, in the alternative, the Commissioner must take cognizance of the fact that the balance of $75,000 due the taxpayer had no fair market value in 1929 and therefore cannot be considered as the equivalent of cash. Accordingly, the profit on the sale of the right as determined by the Commissioner in the amount of $100,080 must be reduced by $75,000 to $25,080".

The tax at 12½% on the foregoing gain of $25,080 would be $3,135, instead of $12,510 paid when the return wa filed so that the overpayment would be $9,375. An audit of the return made by the Commissioner in 1934 showed an overassessment in the foregoing amount. He allowed a refund up to $76.59 and held the claim for the balance of $9,298.41 barred by the statute of limitations. In his certificate of overassessment he reported that he had "determined that the amount of $75,000.00 represented by subordination agreement form of New York Stock Exchange had no fair market value in the taxable year" and he thus acceded to the position taken by the taxpayer in the amended claim when asking to have his tax figured on a gain of $25,080.

The plaintiff contends that the claim of $9,298.41 is not barred and has brought this action to receive the overassessment as found by the Commissioner. The court below disallowed recovery and dismissed the complaint. We think the judgment should be affirmed.

The question principally argued is whether the sale to Blumenthal was a closed transaction in 1929 so that the tax, which was calculated on the difference between the cost to the taxpayer or value as of March 1, 1913, (whichever was greater) and the selling price of $120,000 representing a gain of $100,080, was properly assessed for that year, or whether the tax should have been calculated on an instal-

ment basis. We are foreclosed from computing the tax on an instalment basis because the taxpayer reported the sale in his return as a transaction closed in 1929.

If he had the option to treat it as a "casual" sale, the gain for which might be apportioned under Section 44(b) of the Act of 1928, 45 Stat. 805, 26 U.S.C.A. § 44 note, it was not necessary for him to adopt this method and he had the right to report it as a closed transaction as he did. Having elected to do this he was bound by his election. As was said by Butler, J., in Pacific National Co. v. Welch, 58 S.Ct. 857, 858, 82 L.Ed. ——, decided May 2, 1938: "In case of overstatement and overpayment, the taxpayer may obtain refund calculated according to the method on which the return was made. Change from one method to the other * * * would require recomputation and readjustment of tax liability for subsequent years and impose burdensome uncertainties upon the administration of the revenue laws."

We reached the same conclusion in Strauss v. Commissioner, 2 Cir., 87 F.2d 1018.

The remaining question is whether the amended claim filed on May 16, 1933, though not timely because asserted more than two years after the payment of the tax, was permissible.

■ We think it was not. It changed the ground on which a refund was asked and added a new fact not before brought to the attention of the Commissioner. The original claim sought an apportionment of gains under Section 44(b) of the Revenue Act of 1928 because of the payments by instalment. By asserting in the amendment the additional ground that the transaction should be treated as closed in 1929 because $45,000 of the purchase price had been paid that year and the remaining $75,000 had then no fair market value, the taxpayer interposed an essentially new cause of action. Though the testimony indicates that the subordination agreement was examined by the revenue agent Higgins within the two year period, yet the original claim alleged that the $75,000 was represented by a note which would create an absolute obligation possessing a fair market value, whereas the Commissioner found that the subordination agreement had no such value and all the testimony tended to support the finding. In making an investigation in respect to the original claim the Commissioner had not been asked to value the subor-

dination agreement and so far as the record shows there was no proof before him indicating that it had no market value. As matters stood he might have found from the statement that the $75,000 was represented by a note and from the absence of proof that the subordination agreement had no market value that the taxpayer would have been entitled to return his gains under Section 44(b) but was barred by his election, as the Commissioner held in his first report. In other words, under the original claim the Commissioner was apparently limited in his consideration both on the law and the facts to the sole question whether Section 44(b) was applicable. He based his final certificate upon the additional claim inserted by amendment that the subordination agreement had no fair market value in the year 1929. If the taxpayer had brought out this fact in his original claim he might have obtained some relief for he would then have apprised the Commissioner of facts entitling him to contend that the payment of $45,000 closed the transaction. While a new ground of recovery may be introduced by an amendment to a timely claim in a case where the facts applicable to both the original and amended claim are identical and the amended claim does not require a new investigation, Bemis Bro. Bag Co. v. United States, 289 U.S. 28, 53 S.Ct. 454, 77 L.Ed. 1011, such a situation did not exist here. On the contrary, the addition by amendment of a new ground of recovery, the request for the refund of a larger sum than that asked for in the original claim and the allegation that the subordination agreement had no fair market value in 1929, bring the case within the recent and very strict decisions of the Supreme Court disallowing amendments under similar conditions. United States v. Andrews, 302 U.S. 517, 58 S.Ct. 315, 82 L.Ed. 398; United States v. Garbutt Oil Co., 302 U.S. 528, 58 S.Ct. 320, 82 L.Ed. 405.

■ We have considered the contention of the taxpayer that recovery should be allowed as upon an account stated because the Commissioner issued a certificate of overassessment in the amount of $9,375 and refused payment to the extent of $9,298.41 because of the statute of limitations. But no cause of action on an account stated was pleaded and the certificate of over-assessment did not impute a promise by the government to refund or by the taxpayer to accept the account as settled. On the contrary the certificate stated that the item of

$9,298.41 was barred by the statute of limitations. Stearns Co. of Boston v. United States, 291 U.S. 54, 65, 54 S.Ct. 325, 78 L.Ed. 647. Such a certificate was not an account stated imputing a promise to repay $9,298.41.

Judgment affirmed.