*Decisions will be entered under Rule 50.*

HEWITT-ROBINS INCORPORATED (SUCCESSOR BY MERGER TO ROBINS CONVEYORS INCORPORATED), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 39101. Filed April 10, 1959.

*William E. Murray, Esq.*, for the petitioner.
*Arnold I. Weber, Esq.*, for the respondent.

FORRESTER, *Judge:* Respondent has disallowed claims by petitioner for relief under section 722(b) of the Internal Revenue Code of 1939 [1] in respect of excess profits taxes for the taxable years 1940 to 1944, inclusive. Petitioner requested and we have granted a severance of the issue relating to the period of limitation set forth in section 322(b)(1) of the Internal Revenue Code of 1939 [2] as to 1940, 1941, and 1942, and petitioner has agreed that should respondent prevail here, it will abandon all other issues. Accordingly, the sole issue for decision is whether the provisions of said section 322(b)(1) bar any relief under section 722(b)(4) for said years.

---

[1] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

(1) in one or more taxable years in the base period normal production, output, or operation was interrupted or diminished because of the occurrence, either immediately prior to, or during the base period, of events unusual and peculiar in the experience of such taxpayer.

(2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry,

(3) the business of the taxpayer was depressed in the base period by reason of conditions generally prevailing in an industry of which the taxpayer was a member, subjecting such taxpayer to

(A) a profits cycle differing materially in length and amplitude from the general business cycle, or

(B) sporadic and intermittent periods of high production and profits, and such periods are inadequately represented in the base period,

(4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purposes of this subparagraph, the term "change in the character of the business" includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, a difference in the ratio of nonborrowed capital to total capital, and the acquisition before January 1, 1940, of all or part of the assets of a competitor, with the result that the competition of such competitor was eliminated or diminished. * * *

(5) of any other factor affecting the taxpayer's business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period and the application of this section to the taxpayer would not be inconsistent with the principles underlying the provisions of this subsection, and with the conditions and limitations enumerated therein.

[2] SEC. 322. REFUNDS AND CREDITS.

(b) LIMITATION ON ALLOWANCE.—

(1) PERIOD OF LIMITATION.—Unless a claim for credit or refund is filed by the taxpayer within three years from the time the return was filed by the taxpayer or within two years from the time the tax was paid, no credit or refund shall be allowed or made after the expiration of whichever of such periods expires the later. * * *

62

The stipulated facts are so found.

Petitioner is a corporation with principal office in New York City. Robins Conveyors Incorporated, known prior to 1943 as Robins Conveying Belt Company, was a corporation with principal office in Passaic, New Jersey. It filed its income and excess profits tax returns for the taxable years in controversy with the then collector of internal revenue for the fifth district of New Jersey.

Petitioner is apparently the successor to Robin Conveyors Incorporated, by virtue of a merger in 1947. The term "petitioner" shall hereinafter be used without distinction to designate both Robins Conveyors Incorporated and the present litigant.

Petitioner's corporation income and declared value excess-profits tax returns (Form 1120) and its corporation excess profits tax returns (Form 1121) for the years 1940, 1941, and 1942 were filed on the following dates:

| Taxable year | | Date filed |
|---|---|---|
| 1940 | Tentative | Mar. 12, 1941 |
| | Final | June 16, 1941 |
| 1941 | Tentative | Mar. 16, 1942 |
| | Final | May 15, 1942 |
| 1942 | Tentative | Mar. 15, 1943 |
| | Final | May 15, 1943 |

On December 17, 1943, petitioner and respondent entered into an agreement extending until June 30, 1945, the time within which respondent might make an assessment of excess profits taxes for the taxable year 1940. No further such agreements were entered into with respect to 1940, 1941, or 1942.

The last payments by petitioner of excess profits taxes in respect of each year were as follows:

| Taxable year | Date of last payment |
|---|---|
| 1940 | Oct. 2, 1944 |
| 1941 | Dec. 21, 1942 |
| 1942 | June 2, 1945 |

On September 15, 1943, petitioner filed original Form 991 applications for relief under section 722 for 1940, 1941, and 1942. For each year petitioner checked as applicable sections 722(b), (2), (3), and (5). The following statement was attached to each application:

*Rider attached to the application for relief under Section 722 of the Internal Revenue Code (Form 991) filed by Robins Conveyors Incorporated, a New Jersey corporation, with respect to the calendar year * * ***

It is not possible for the taxpayer, prior to September 16, 1943, to obtain, prepare, and present all the detailed information required to establish its eligibility for relief and the amount of its constructive average base period net income. In accordance with the provisions of Section 30.722–5(a)(1) of Treasury

Regulations 109, as amended by T.D. 5264, the taxpayer expects to submit such information within a reasonable time after filing this application, as a supplement to the application. In this application, the taxpayer has estimated the amount of its constructive average base period net income tentatively on the basis of the results for the years 1925 to 1928 inclusive, and has, in turn, computed an estimated amount as the refund to which it claims to be entitled. Since both such amounts are merely estimates, such amounts may be changed by reason of the detailed information to be furnished in the supplement to this application, subsequently to be filed, and the taxpayer accordingly reserves the right so to change such amounts.

The taxpayer's excess profits tax computed under Subchapter E of Chapter 2 of the Internal Revenue Code (without the benefit of Section 722 of such Code) results in an excessive and discriminatory tax, within the meaning of Section 722 of the Internal Revenue Code.

*Grounds for relief under Section 722 claimed by the Taxpayer (supplementing Schedule B of Form 991)*

The taxpayer is engaged principally in the manufacture and erection of material handling equipment.

The excess profits tax is considered discriminatory because the business of the taxpayer was depressed during the base period and such years did not represent a period of normal earnings for the taxpayer.

Also, the taxpayer's business cycle is different from that of the general business cycle.

Relief is claimed on the above grounds in pursuance of Section 722(b)2 and 722(b)3A.

The taxpayer claims that the factors above mentioned as constituting grounds for relief under Section 722(b) of the Internal Revenue Code have the effect of causing the average base period net income of the taxpayer not to reflect the normal earnings, and to result in an excessive and discriminatory tax. The taxpayer also claims that all such factors may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period, and to the extent that it may be held that such factors do not furnish adequate grounds for relief under the aforementioned section, taxpayer claims relief with respect to such factors under Section 722(b)(5) of the Internal Revenue Code.

The taxpayer further claims that there are other factors affecting its business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period within the meaning of Section 722(b)(5) and it reserves the right to submit detailed information with respect to such factors, as a supplement to this application, at a later date.

Those portions of the Form 991 applications checked by petitioner read as follows:

X 2. The business of the taxpayer was depressed during the base period or the taxpayer was a member of an industry which was depressed during the base period because of temporary and unusual economic events (section 722(b)(2)).

(a) Describe the temporary economic events unusual in the case of the taxpayer or an industry of which it was a member.

(b) If claim of depression is based on membership in depressed industry, describe industry, and furnish names and addresses of other members of such industry.

3. The business of the taxpayer was depressed in the base period because of membership in an industry affected by conditions subjecting the taxpayer to:

X  A profits cycle differing materially from the general business cycle (section 722(b)(3)(A)), or

X  Sporadic and intermittent periods of profits inadequately represented in the base period (section 722(b)(3)(B)).

    (a)  Describe character of the industry and furnish names and addresses of other members of the industry.

    (b)  Furnish data establishing that the taxpayer was depressed by reason of an unusual profits cycle, or

    (c)  Furnish data establishing that the taxpayer was depressed by reason of realization of sporadic profits inadequately represented in the base period.

    *       *       *       *       *       *       *

X  5. Other factors producing an average base period net income which is an inadequate standard of normal earnings and which are not inconsistent with the principles and limitations of section 722(b) (section 722(b)(5)).

    (a)  Describe other factors claimed to affect business during the base period and to result in an average base period net income which is an inadequate standard of normal earnings.

That portion of the application relating to section 722(b)(4), which was not so checked, reads as follows:

4. The business of the taxpayer was commenced or there was a change in the character of the business immediately prior to or during the base period (section 722(b)(4)).

    (a)  On what date did commencement of business or change in character of business occur?

    (b)  If change in character of the business has occurred, submit statement of:

        (1)  Nature of change in character of business.

        (2)  Portion of the definition in section 722(b)(4) within which such change is claimed to have occurred.

        (3)  Evidence supporting contention that average base period net income does not reflect normal operations for the entire base period.

    (c)  Did the business reach, by the end of the base period, the earning level it would have reached if the business had been commenced, or if the change in the character of the business had occurred, 2 years prior to the time the commencement or change occurred? If answer is "no," furnish particulars.

    (d)  Was change in capacity for production or operation of business consummated during a taxable year ending after December 31, 1939, as a result of a course of action to which taxpayer was committed prior to January 1, 1940?

    (e)  If answer to (d) is "yes":

        (1)  State date upon which such change was consummated and extent to which income for such year reflects such change.

        (2)  Submit evidence of commitment to a course of action prior to January 1, 1940.

        (3)  Attach schedule showing net capital addition or net capital reduction (section 713(g)(1) or (2)) and the amount of money or property expended after the beginning of the first excess profits tax taxable year under the Internal Revenue Code in changing the capacity for production or operation of the business.

In late 1943, petitioner's then comptroller, John T. Hoyt, discussed the case with the revenue agent assigned thereto. The above-quoted

riders attached to the applications were also discussed. Hoyt explained that a number of petitioner's key officials were engrossed in war contracts, and requested permission to supplement the initial information at a later time. The revenue agent acquiesced in this request.

Thereafter, and on December 20, 1943, Hoyt submitted on petitioner's behalf a compilation entitled "Supplementary Information and Data in Support of Application for Relief under Section 722." This compilation represented the "detailed information" mentioned in the riders attached to the applications and also the supplementary material Hoyt had in mind when he discussed the case with the revenue agent. It consists solely of facts and figures in support of petitioner's claims under section 722(b) (2), (3), and (5). No reference exists therein to section 722(b) (4) or to facts relating to any change in petitioner's management or operation during or immediately prior to the base period. That portion touching upon the claim under section 722(b) (5) reads as follows:

*Schedule B–(5)*

The below described "other factors producing an average base period net income which is an inadequate standard of normal earnings" are closely related to and have a direct bearing on previously discussed questions of "temporary and unusual economic events" and variant profits cycle. Merely to simplify presentation and conform with schedule headings, they are treated separately.

As previously developed, the industries constituting Robins' principal markets (iron and steel, electric light and power, gas, coal and non-ferrous mining and treatment plants) have a well recognized tendency to postpone initiation of expenditures for new plant and equipment until after they have enjoyed a considerable period of prosperous business and built up reserves for this purpose.

The May 1942 issue of Survey of Current Business (U.S. Bureau of Foreign and Domestic Commerce) under Capital Expenditures in Selected Manufacturing Industries, has the following to say on this subject with reference to the iron and steel industry (page 16) :

"The timing of the fluctuations in the outlays in this industry (i.e. iron and steel) are of special interest. The high and low points in the short-term fluctuations in these outlays do not have a high simultaneous correspondence with those in general business during the period covered (1919–1941) by these estimates. The blast furnace and steel works industry thus differs from some of the other industry groups and from the total for all manufacturing.

"The reasons for this difference are not altogether clear. In several cases, the large corporations have made unusually large expenditures immediately following years of heavy production and good earnings. In view of the extensive size and many installations, *considerable time elapses between the initiation of such projects and the actual expenditures for these purposes.* In the main, fluctuations in capital expenditures thus tend to lag somewhat after the fluctuation in the production of steel products."

The corresponding lag behind general business improvement, during a recovery period such as the late 1930's, is further exaggerated by the above mentioned considerable lapse of time between the original "initiation of such projects

and the actual expenditures" which applies in general to all the aforedescribed industries constituting Robins principal markets. The resultant effect of these time lag factors was to postpone until subsequent years a very substantial volume of business that otherwise should have materialized and been reflected in billings during the tax base period 1936–1939.

Concrete evidence of this fact is strikingly brought out by an analysis of Robins billings during the three years 1940–1942. The aggregate of jobs billed during this period which were *originally initiated* during the tax base period 1936–1939 totals approximately $4,631,900. Had Robins business been of the sort where inquiries and quotations are quickly translated into cash sales, its billings during the tax base years 1936–1939 (actually totalling $7,684,421) would have been increased by perhaps 90% of $4,631,900 or approximately $4,168,700. Adding this figure to the one given above *would have resulted in total billings of $11,853,121 during the four tax base years or 17% in excess of actual total billings of $10,162,595 for the years 1925–1928 which the taxpayer claims as its constructive average base period.*

Because of the combined effect of all the aforedescribed tendencies and conditions influencing the industries comprising its major markets, the taxpayer claims its recovery lagged substantially behind that of general business during the tax base years 1936–1939 and that consequently its net income during that period was extremely subnormal.

On July 13, 1944, petitioner submitted to the internal revenue agent in charge at Newark further information supplementary to and explanatory of certain portions of the material submitted December 20, 1943. No part of this new data mentions section 722(b)(4) or refers to facts relating to any change in petitioner's management or operation during or immediately prior to the base period.

On January 23, 1945, petitioner filed a Form 991 application for the taxable year 1943, in which it checked as grounds for relief section 722(b)(2), (3), and (5). A single sheet attached to the Form 991 contained a short computation and the following language: "Complete details in substantiation of this claim are set forth in a report submitted December 21, 1943 to the Internal Revenue Agent in Charge, Newark, N.J." The cited "report" consists of the material submitted on December 20, 1943.

On September 7, 1945, petitioner submitted additional information and material in substantiation of all of the above claims for relief. Therein petitioner sought solely to establish that it was a member of a certain industry, and that such industry was depressed during the base period. Section 722(b)(4) was not mentioned, nor was any reference made to facts related to any change in petitioner's management or operation during or immediately prior to the base period.

On January 7, 1948, prior to any final determination by respondent, petitioner filed papers characterized by it as amendments to its original Forms 991 for each of its taxable years 1940 to 1943, inclusive. An original application for the taxable year 1944 was filed at the same time.

In each of the above papers petitioner claimed relief under section 722(b) (2), (3), (4), and (5). That filed in respect of 1940 contains the following typed statement: "Note A—See data submitted in support of Application (Form 991) as originally filed and report of Pettit, Bausman & Co. being submitted herewith." A similar statement appears on the documents filed at that time for each of the taxable years 1941, 1942, and 1943, and the application for 1944 incorporated by reference all substantiating material previously submitted.

The Pettit, Bausman & Co. report mentioned above consisted of a detailed report in support of petitioner's claims under section 722(b) (4).[3]

On January 30, 1948, Max Kovolick, an agent of respondent, visited petitioner's office to discuss the section 722 case and request further information. In the conference that followed, Kovolick took the position that the statute of limitations barred the claims under section 722(b) (4) in respect of 1940, 1941, and 1942, and that claims under that provision were still open only as to 1943 and 1944. Thereafter, in further conferences and negotiations between the parties, respondent's representatives considered data presented in support of

[3] The following quotations from such report characterize petitioner's section 722(b)(4) claim:

"Prior to 1935 the merchandise phase of its business was considered by it as largely incidental to its contract business. However, in 1935 a major change in its basic policy was effected. Its objective was to bring the business of its merchandise division at least equal to the levels of its contract business. * * *

"A further departure from the Company's ordinary activities, during the period reviewed by us, occurred in 1934 when the Company received an exclusive license from the Chance Estate to manufacture and construct plants for washing, cleansing and treating bituminous coal and bituminous coal mine refuse by means of the Chance Sand Flotation Process. Many difficulties arose. The operation resulted in severe losses to the Company and on November 29, 1935 the Company decided to cancel its contract. However, it was not until April 7, 1937 that the Company succeeded in finally disposing of its contractual obligations in connection with this operation.

"As heretofore indicated, in 1935 the management of the Company inaugurated a new sales policy that has had a considerable influence on its sales and earnings during the base period and in later years. Stated briefly, this new policy involved the inclusion of merchandise sales as an integral part of its major sales activities, with the objective of materially raising the percentage of its total business done in that division. * * *

"In addition to the foregoing, in 1935 and the years immediately prior, the Company had become increasingly aware of the possibility of enlarging its share of the general conveying machinery market by developing new products. In 1936, two new types of screens, the 'Style J Vibrex' and the 'Contractors' Screen,' were introduced to the market. These were followed in 1937 by the 'Eliptex' screen, which represented a radical departure from traditional screen design.

"To take advantage of increased Screen Cloth sales expected to result from broadening its line of Vibrating Screens, the Company engaged in extensive research during 1934–1935 to develop a wholly new type of oil tempered Wire Screen Cloth requiring special techniques in weaving, for which manufacturing facilities were arranged. Because of its very superior resistance to abrasion this new Screen Cloth sold as Gyraloy and later Super-Gyraloy, proved very effective in screening Coke and other sharp materials and during subsequent years became an increasingly important and profitable merchandise item."

petitioner's section 722(b)(4) claims for the years 1940, 1941, and 1942, but respondent's position that such claims were barred was reasserted and was never abandoned.

By motion made and granted, the sole issue for decision is whether the section 722(b)(4) relief now sought for the years 1940, 1941, and 1942 is barred by section 322(b). For that reason we need not concern ourselves with matters pertinent to respondent's regulations or alleged acts of waiver on his part. Respondent's power to waive regulations would seem to be coextensive with his power to promulgate them, but he is without authority to waive or otherwise relax mandatory statutory requirements. *United States* v. *Garbutt Oil Co.*, 302 U.S. 528, 533; *Burwell Motor Co.*, 29 T.C. 224, 230.

In *United States* v. *Memphis Cotton Oil Co.*, 288 U.S. 62, a timely claim was filed, constituting in essence a bare demand for a refund in a stated amount. After the statutory period had expired for filing an original claim the taxpayer was permitted to amend his claim to state for the first time a specific ground upon which he sought such refund.

On the same day, in *United States* v. *Henry Prentiss & Co.*, 288 U.S. 73, the Court held that another taxpayer could not amend out of time a timely claim based on a specific ground, where the proposed amendment would introduce for the first time a new and unrelated basis for a refund.

The cases were reconciled in *United States* v. *Factors & Finance Co.*, 288 U.S. 89, also decided that day, in terms of the relationship of the original claim to its purported amendment. In the *Memphis* case the original claim was sufficiently broad to include within its scope the later specifying amendment. A full investigation of that broad original claim would have required the Commissioner to consider every ground or theory under which the taxpayer might conceivably be entitled to a refund, including that set forth in the later amendment. To be sure, the Commissioner is under no duty to undertake such a task and he might properly reject such a claim for its very vagueness. Until he does so, however, the taxpayer is free to file an amendment thereto setting forth any specific ground or basis for relief encompassed within the vast scope of the original timely claim. The regulations had not been followed, but the statute had been satisfied as to any and all claims so embraced.

In *Prentiss*, on the other hand, the specific nature of the original claim narrowed the scope of inquiry required for a full and fair investigation, and by implication abandoned all other grounds. This claim, again, satisfied the statute as to all matters fairly within the scope of the investigation it required, which was here, however, much narrower than in *Memphis*. The later claim, based on a theory foreign

to that originally set forth, fell outside of that investigatory scope and hence was barred because it was, in effect, a new claim filed after the statutory period. See also *United States* v. *Kales*, 314 U.S. 186; *United States* v. *Garbutt Oil Co., supra; United States* v. *Andrews*, 302 U.S. 517; *Moore Ice Cream Co.* v. *Rose*, 289 U.S. 373; *Bemis Bro. Bag Co.* v. *United States*, 289 U.S. 28. In *United States* v. *Andrews*, *supra*, the Court said at page 521:

> The opinion [in *United States* v. *Factors & Finance Co., supra*] points out that the very generality of the original claim required that the Commissioner's audit go into the question of invested capital and that, therefore, the more specific amendment called attention to no new matter not covered by the investigation the Commissioner had to make in examining the claim as originally filed.

Perhaps the best statement of the doctrine is to be found in *Pink* v. *United States*, 105 F. 2d 183, 187 (C.A. 2):

> Whether a new ground of recovery may be introduced after the statute has run by amending a pending claim filed in time depends upon the facts which an investigation of the original claim would disclose. Where the facts upon which the amendment is based would necessarily have been ascertained by the commissioner in determining the merits of the original claim, the amendment is proper. Bemis Bros. Bag Co. v. United States, 289 U.S. 28, 53 S. Ct. 454, 77 L. Ed. 1011; United States v. Memphis Cotton Oil Co., 288 U.S. 62, 53 S. Ct. 278, 77 L. Ed. 619; United States v. Factors & Finance Co., 288 U.S. 89, 53 S. Ct. 287, 77 L. Ed. 633. The rule is otherwise when the amendment requires the examination of new matters which would not have been disclosed by an investigation of the original claim. United States v. Andrews, 302 U.S. 517, 58 S. Ct. 315, 82 L. Ed. 398; United States v. Garbutt Oil Co., 302 U.S. 528, 58 S. Ct. 320, 82 L. Ed. 405; Marks v. United States, 2 Cir., 98 F. 2d 564. * * *

The foregoing rule applies with equal force and effect to claims for relief under section 722. *Burwell Motor Co., supra.* Applying that rule to the facts before us, we have no choice but to sustain respondent's position.

The original claims were specific. Together with all other material submitted within the statutory period, they do not direct respondent's attention to the alleged changes underlying petitioner's claims under section 722(b)(4). Subsections (b)(2) and (b)(3) of section 722 refer to conditions external to the taxpayer, whereas section 722(b)(4) relates to matters of internal concern. The original claims and supporting material tend to suggest stability and lack of substantial change during the base period, and, if anything, would seem to direct respondent's attention away from, rather than toward, the matters underlying petitioner's subsequent position. Petitioner's claim under 722(b)(5) was expressly stated as predicated on essentially the same factors as urged for 722(b)(2) and (b)(3). The claims asserted under section 722(b)(4) on January 7, 1948, were thus new claims, and barred by limitations as to 1940, 1941, and 1942.

We find no merit in petitioner's argument based on the riders attached to the original applications. Those riders referred to material in support of the claims under section 722(b) (2), (3), and (5) then being made, not to new and different claims yet to come. This is borne out by the fact that the very material subsequently submitted in fulfilment thereof was so limited.

Even the timely assertion of relief under section 722(b) (4) on one theory has been held insufficient to toll the statutory bar against a claim under that same statutory provision, but on a new and different factual theory. Cf. *Burwell Motor Co.*, *supra*. The disparity between the original and later claims in the instant case is far greater than in *Burwell*.

Petitioner has devoted a substantial portion of its brief to the question of whether respondent in fact considered the untimely claims on the merits. We have made a finding of fact appropriate thereto but that question is of no moment here. As the Supreme Court said in *United States* v. *Garbutt Oil Co.*, *supra* at page 533:

The argument confuses the power of the Commissioner to disregard a statutory mandate with his undoubted power to waive the requirements of the Treasury regulations. The distinction was pointed out in United States v. Memphis Cotton Oil Co., 288 U.S. 62, 71, wherein it was said: "The line of division must be kept a sharp one between the function of a statute requiring the presentation of a claim within a given period of time, and the function of a regulation making provision as to form. The function of the statute, like that of limitations generally, is to give protection against stale demands. The function of the regulation is to facilitate research." In the cited case, and others decided at about the same time, we held that, while the Commissioner might have enforced the regulation and rejected a claim for failure to comply with it in omitting to state with particularity the grounds on which the claim was based, he was not bound to do so, but might waive the requirement of the regulation and consider a general claim on its merits. This was far from holding that after the period set by the statute for the filing of claims he had power to accept and act upon claims that complied with or violated his regulations. * * *

Reviewed by the Special Division.

*Decision will be entered for the respondent.*