WESTERN CONTRACTING CORPORA-
TION, Petitioner,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

No. 16202.

United States Court of Appeals
Eighth Circuit.

Nov. 10, 1959.

Ralph E. Davis. Chicago, Ill. (Peter L. Wentz, Samuel H. Horne, and Hopkins, Sutter, Owen, Mulroy & Wentz, Chicago, Ill., on the brief), for petitioner.

Carolyn R. Just, Atty., Dept. of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Robert N. Anderson, and S. Dee Hanson, Attys., Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before          WOODROUGH          and MATTHES,    Circuit    Judges,    and MICKELSON, District Judge.

MATTHES, Circuit Judge.

The Commissioner of Internal Revenue determined deficiencies in petitioner's (sometimes referred to herein as "Western") income for the taxable years of 1948 and 1949. After an extended trial on petition for redetermination, the tax court found and adjudged that for 1948 and 1949 there was a deficiency in petitioner's income tax in the amounts of $158,105.81 and $120,160.90, respectively. From this ruling petitioner has brought the case to this court on petition for review.

Two questions are presented. First, whether monthly payments made by Western to dealers in heavy construction equipment in the total amount of $731,046 during 1948 and $586,837.23 during 1949, constituted rentals so as to be de-

ductible under § 23(a) (1) (A), 1939 Internal Revenue Code [Title 26 U.S.C.A. § 162(a) (3), 1954 I.R.C.], as contended by petitioner, or, whether by making said payments petitioner acquired an equity in the equipment, as found by the Tax Court. Second, if the payments were not deductible as rent, is petitioner entitled to depreciation deductions for the property involved in amounts greater than that allowed by the Commissioner and approved by the Tax Court?

While the record is voluminous, we find little dispute as to the relevant facts which are set out in detail in the memorandum findings of fact and opinion of the Tax Court. See Western Contracting Corp. v. Commissioner, 17 T.C.M. 371, T.C.Memo. 1958–77, CCH Dec. 22,960 (M).

Prior to 1946, Western, an Iowa corporation, was engaged in what is referred to in the record as light construction work, such as building highways and airports. During 1946 Western entered into contracts for heavier types of construction, such as grading and earth moving in the building of dams, tunnels, canals and turnpikes. The performance of these contracts required the use of heavy equipment. While Western owned some of the equipment needed for the heavier construction work, it required more. Its working capital was low and banks were unwilling to permit it to tie up short term borrowings in capital assets. In an effort to obtain the required working capital Western undertook, but unsuccessfully, to sell equipment debentures. In order to conserve what capital it had and to acquire the needed equipment, arrangements were worked out and consummated which give rise to the first issue in this case.

For use on these projects, Western obtained 123 pieces of heavy equipment by leases for varying terms. Thirty of the items were returned to lessors at the end of the lease terms, and deduction of the rent paid therefor is not in controversy. The remaining 93 pieces, in issue here, were obtained by Western under 75 different written instruments, each of

which was called "Lease Agreement." Typical of all the leases is the following:

"This Agreement made by and between Missouri Valley Machinery Co. of Omaha, Nebraska, Lessor, and Western Contracting Corporation of Sioux City, Iowa, Lessee:

"Witnesseth, That the owner has this 18th day of February, 1947, rented to the Lessee the following described machinery and/or equipment, hereinafter called 'Equipment':

"1—New 'Caterpillar' Diesel Electric Set, Self-Regulated, with Standard gasoline starting engine, Model D-17000, Serial No. 8S 5064, equipped with No. 1F 8999 Generator Arrangement, Serial No. 101KH406, Foundation bolts, Fuel Lines, Muffler, Radiator with Blower Fan, and Safety Device.

"The parties hereto agree as follows:

"Said equipment shall be shipped to Lessee at Jenkins c/o G. R. Jenkins, * * *, Kentucky, on or about the 18th day of February, 1947, freight or delivery charges collect.

"Lessor further agrees to furnish in connection with said equipment, the following:

"as shown above

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"This lease is for a minimum period of eighteen months commencing on the 18th day of February, 1947, and Lessee agrees to pay as rental therefor the sum of $370.00 per month . . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"Lessee agrees to keep the equipment in good repair and condition, and to return the equipment in as good condition as when leased, reasonable wear and tear excepted.

"Lessee shall be liable for any and all damage caused to any persons or property while said equipment is in its possession.

"Lessor
  "Missouri Valley Machinery Co.
"By (Signed) C. A. Needham
  "General Manager
"Lessee
  "Western Contracting Corporation
"By (Signed) P. J. Boyle, Treas.
  "(Signed) H. Garland Everist, Secy."

The questioned leases were in the main entered into with regular franchise equipment dealers. The dealer was designated in the written instrument as lessor and Western as lessee. All but 3 pieces of equipment which Western obtained under the leases were new. None of the 75 leases contained a clause or agreement giving Western, as lessee, an option to purchase the equipment at any time during or at the end of the rental term. Neither was there any evidence that a side agreement, written or oral, had been entered into between Western and any of the equipment dealers, granting Western such a right or option. In fact, all of the direct testimony of the witnesses was to the contrary, that is, no such agreement was entered into or existed.

The leases were for varying terms ranging from 7 to 28 months. In this connection, the Tax Court found that the average length of the lease term was 13.98 months.

Upon execution of a lease, the dealer-lessor would procure a loan from a bank, in nearly all instances the Toy National Bank of Sioux City, Iowa. The amount borrowed apparently varied but in most situations it equalled the normal purchase or list price of the equipment described in the lease. To evidence the loan, the dealer gave its note to the bank and to secure payment thereof also gave a chattel mortgage upon the leased equipment. Additionally, the dealer assigned the lease to the bank. Western consented

in writing to each assignment and thereafter Western made payments of the stipulated rent to the bank which had made the loan. Throughout the terms of the leases, it is admitted that the equipment was subject to unusually heavy use under adverse geographical conditions. On one project, equipment was worked three 8-hour shifts. Most dealers made periodic inspections of the equipment.

In each case Western made all payments due under the lease, and at the end of the "minimum period" designated in each of the 75 leases, Western purchased the property described therein, thus eventually becoming the owner of all 93 pieces.[1] The dealers arrived at the amount which they offered to accept for the property, described in the record as end payments, by taking their list price and adding thereto their finance charges, such as the interest paid to the banks, and deducting therefrom the total of the rental payments made by Western. The sales came about and were consummated in this manner: At or near the expiration of the minimum period, the dealer-lessor formally offered to sell to Western each item of equipment covered by the lease. Typical of the letter containing the offer is the following:

"July 18, 1950
"Western Contracting Corporation
Sioux City, Iowa
"Attention: Mr. J. P. Nye
"Gentlemen:

"We have for sale 1-Model 54B Bucyrus Erie combination dragline and clamshell No. 69835, powered with Buda Diesel engine. This machine is used and is quoted you at $14,458.24 as is where is.

"If you are interested in this machine please contact us as it is offered subject to prior sale.

"Yours very truly,
"Fuchs-Clayton Machinery Co.
"(Signed) Robert S. Hebert
"Robert S. Hebert"

Western accepted each offer in writing and upon receipt of an invoice from the dealer showing the amount due, issued its check to the dealer for such amount. Thereupon, the dealer executed and delivered to Western a conventional type bill of sale. Thereafter, Western used the amount paid at the time it acquired title to the property as the cost basis of the equipment and claimed depreciation on that basis. Some pieces so acquired were subsequently sold or traded-in by Western for amounts well in excess of the express "end payment," capital gain being reported according to applicable statutes.

The question presented is whether the payments made by Western under and pursuant to the lease agreements constituted rental payments deductible as a trade or business expense within the meaning of § 23(a) (1) (A) of the Internal Revenue Code of 1939, which provides:

"§ 23.  Deductions from gross income.

"In computing net income there shall be allowed as deductions:

"(a) Expenses.

"(1) Trade or business expenses.

"(A) In general.  All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including * * * rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity."

The provisions of the foregoing statute relating to the taking of title to or acquiring an equity in property, being stated in the alternative, it follows that if the controverted amounts paid by Western were for the use or possession of property to which Western was taking

[1]  48 of these pieces were purchased in years subsequent to the taxable years in controversy, 47 in 1950 and 1 in 1951.

title *or* in which it had an equity, the Commissioner and Tax Court properly ruled the question, because such payments do not fall in the category of a deductible business expense. See Oesterreich v. Commissioner of Internal Revenue, 9 Cir., 226 F.2d 798, 802, and cases cited.

■ Thus, the underlying and basic issue is—was Western acquiring an equity in the equipment. The ultimate conclusion of the Commissioner and Tax Court is based on the initial premise that the lease agreement, as written, did not represent the real intent of the parties. It is true that, in determining this basic issue, we must look to the intention of the parties and the actual legal effect of the instrument. Oesterreich v. Commissioner of Internal Revenue, supra, 226 F.2d at page 801; Earl L. Lester v. Commissioner, 32 T.C. 60; Benton v. Commissioner, 5 Cir., 197 F.2d 745, 752; D. M. Haggard, 24 T.C. 1124, 1128, affirmed 9 Cir., 241 F.2d 288; Breece Veneer & Panel Co. v. Commissioner of Internal Revenue, 7 Cir., 232 F.2d 319. In D. M. Haggard, supra, 24 T.C. at page 1129, the Tax Court recognized the rule in this language: "To properly discern the true character of the payment, therefore, it is necessary to ascertain the intention of the parties as evidenced by the written agreements, read in the light of the attending facts and circumstances *existing at the time the agreement was executed.*" (Emphasis supplied.) Stated differently, it is the substance of the transaction, and not its mere form which controls, and the substance is to be determined from the intent of the parties. Hervey v. Rhode Island Locomotive Works, 93 U.S. 664, 672, 23 L.Ed. 1003; Heryford v. Davis, 102 U.S. 235, 244, 26 L.Ed. 160. This rule is tersely stated in Oesterreich, supra, 226 F.2d at page 801: "If the parties enter into a transaction which they honestly believe to be a lease but which in actuality has all the elements of a contract of sale, it is a contract of sale and not a lease no matter what they call it nor how they treat it on their books."

■ The foregoing principle apparently has been consistently applied in cases where the payments were made under lease arrangements with options to purchase, thus giving the payments "chameleon characteristics," Mertens Law of Federal Income Taxation, Vol. 4, § 25.109. As stated in Chicago Stoker Corporation, 14 T.C. 441, 444, "Cases like this, where payments at the time they are made have dual potentialities, i. e., they may turn out to be payments of purchase price or rent for the use of the property, have always been difficult to catalogue for income tax purposes." Thus, where the true nature of payments made under a lease-purchase instrument is drawn into question in tax cases, it is necessary to ascertain what the parties intended.

Here, insofar as the clear and unambiguous terms of the instruments are concerned, they created the usual obligations found in a straight lease agreement. However, the Tax Court looked beyond the leases to so-called "economic factors" and deduced therefrom the legal conclusion that the parties in fact intended a sale at the time the leases were entered into—thereby in effect reading into the leases an implied option or agreement which gave Western a right to buy the equipment. Having surmounted this first step, the Tax Court then applied the well-recognized standards used by the courts in lease-purchase agreements, and arrived at the ultimate conclusion that the facts and circumstances demonstrated that the parties intended to effect a sale of the equipment at the time the agreements were executed, and that by making payments thereunder, Western was acquiring an equity within the meaning of § 23(a) (1) (A).

■ A detailed recital of each of the circumstances developed by the evidence would unduly burden this opinion. Let it suffice to say that we gave due consideration to these factors which apparently greatly influenced the decision of the Tax Court: (1) the bank transactions by which the dealer-lessor was able to procure through a loan an amount

which in most instances represented his investment in the leased equipment; (2) the financial inability of Western to purchase the equipment outright; (3) the terms of the lease agreements which averaged 13.98 months; (4) the obligation of Western under the agreements to pay the rental regardless of whether equipment was in actual use;[2] (5) the purchase by Western of all 93 pieces of equipment at the end of the "minimum periods"; (6) the relationship of the end payment to the total of the rentals paid;[3] (7) the fair rental value of the equipment;[4] (8) the fair market value of the equipment when Western acquired title thereto;[5] (9) the custom or practice in the trade to first offer equipment for sale to a lessee at the end of the "minimum period."[6] While the presence of these factors may go beyond mere "coincidence," we are in disagreement with the Tax Court that, viewed collectively, they establish that "(t)he so-called lease agreements covering the 93 pieces of equipment were in substance *installment sales agreements*," or that "(u)nder all of the circumstances, it was petitioner's intent to acquire title to and retain each of the 93 items of equipment at the time it entered into each agreement with a dealer,"[7] or that " * * * the so-called lease transactions were not what they purported to be, and that petitioner was acquiring an *equity* in the equipment by means of making payments under the so-called lease agreements."[8]

■ What is the substance of these legal conclusions? Professor Williston defines a *sale* as "an agreement whereby the seller transfers the property in goods to the buyer for a consideration called the price," and a *contract to sell* as a "contract whereby the seller agrees to transfer the property in goods to the buyer for a consideration called the price." Williston on Sales, Rev.Ed., Vol. 1, § 1, p. 2. See also 77 C.J.S. Sales §§ 1a and 1b. It is perfectly clear that the lease agreements, standing alone, cannot be construed to be either sales agreements or contracts to sell. This is so because they neither purported to transfer title when they were entered into, nor obligated the dealers-lessors to do so in the future. The absence of either

2. § 23(a) (1) (A) provides for deductions when rentals are paid for "continued use or possession * * * of property * * *."

3. The Tax Court found that the rentals paid averaged 77.20% of the retail list price; however, the "end payments" were by no means nominal for all payments (rentals and end payments) totalled $1,950,309, $408,531 of which represented "end payments." Cf. Oesterreich v. Commissioner of Internal Revenue, 9 Cir., 226 F.2d 798 (transfer of title upon payment of additional $10.00); Jefferson Gas Coal Co. v. Commissioner of Internal Revenue, 3 Cir., 52 F.2d 120 (transfer of title upon payment of additional $1.).

4. There was direct and positive evidence that, in view of the strenuous and nearly constant use of the equipment, the rental rates provided for were fair and reasonable.

5. There was direct evidence that the end payments represented the fair market value of the property. The Commissioner and tax court attach little significance to this evidence, rather they emphasize that in almost every case in which Western subsequently disposed of the equipment it realized an amount in excess of the cost thereof as represented by the end payment. The fact that ultimately—from 4 months to 9 years—after Western acquired title thereto, it was able to sell or trade-in a number of pieces of the equipment for more than its cost, does not establish or prove that when the leases were entered into many months before it acquired a *vested right* to purchase the leased property at the end of the minimum periods.

6. The dealers who testified stated that inasmuch as they were primarily in the business of selling new equipment, they were eager in all cases to sell the leased equipment at the end of the lease term; that by obtaining the list price for the equipment "where is, as is" they were able to realize their normal profit, and that it was customary to offer the equipment first to the lessee in possession thereof.

7. The Tax Court made these findings of fact.

8. Legal conclusion of Tax Court appearing under its "opinion."

an option clause or a stipulation providing that upon payment of the stipulated rent title would vest in Western, is likewise fatal to a contention that the instruments upon their face have the characteristics of a conditional sales contract. See Williston on Sales, Rev.Ed., Vol. 2, § 336, and compare Burroughs Adding Mach. Co. v. Bogdon, 8 Cir., 9 F.2d 54.

■ Since terminology of tax statutes, absent specific definition, is to be taken in its plain, ordinary meaning, Comar Oil Co. v. Burnet, 8 Cir., 64 F.2d 965, 968, certiorari denied 290 U.S. 652, 54 S.Ct. 69, 78 L.Ed. 565, it is apparent that these leases, on their face, created no "equity" in Western. To avoid this fact, the Commissioner and the Tax Court contend, and must contend, that the lease agreements did not represent the intent of the parties.[9]

■ However, this record is barren of probative evidence affording proof that the lease agreements did not express the true intent of the parties at the time they were entered into. Indeed, the Tax Court found, "It is true, as petitioner contends, that none of the agreements involved here contained options to purchase. Furthermore, witnesses, including five representative dealers, testified that petitioner was under no obligation and had no vested right to purchase the equipment in controversy at the end of the so-called lease term." The court then attempted to minimize this uncontradicted showing, by pointing out that it was a custom among dealers to offer the "allegedly" leased equipment for sale, first to the "so-called" lessee, and that this was always done. The inference is to be drawn from the court's finding in this regard that Western was aware of this custom apparently practiced by some of the dealers. However, the Tax Court failed to find, and our search of the record fails to reveal, any

showing of Western's familiarity with this industry custom. Compare Earl L. Lester v. Commissioner, 32 T.C. 607. In any event, if this practice prevailed, there was no provision expressly incorporating it into the lease agreements, and there is no warrant in the evidence for holding that such practice became a part of the agreements by implication so as to legally transform the leases into contracts for the sale of property, or to grant Western the right or an option to purchase the equipment.

Although the facts at first blush, viewed retrospectively, might indicate a studied arrangement whereby Western was able to obtain the equipment at "bargain" prices with resultant tax advantages, nevertheless when the proper legal tests are applied, resolution of the basic issue presents no earth shaking problem. Boiled down to the essentials, we have a case where the parties, after arms length negotiations, entered into lease agreements whereby Western was able to procure possession of desired and needed construction equipment. There was nothing illegal about the transactions; they were not contrary to public policy, nor on their face designed as an ingenious scheme or device to evade payment of taxes. As stated in Benton v. Commissioner of Internal Revenue, 5 Cir., 197 F.2d 745, at page 752: "the parties had full liberty to contract as they pleased." In fact, the practice of leasing heavy construction equipment seems prevalent among the trade and may constitute good business. See Note, 11 Tax. L.R. 65; Blumenthal and Harrison, "The Tax Treatment of the Lease With an Option to Purchase," 32 Texas L.R. 839; Newlin, "Leasing Industrial Machinery—Some Tax Problems of the Lessee," 33 Taxes 138.

■ In a proper case, the economic factors of the situation may be important in interpreting an agreement, and in

9. In Fishing Tackle Products Co., 27 T.C. 638, 646, the Tax Court held that, absent a *right* to exercise the purchase option, sub-tenant of lessee was not acquiring an equity within the meaning of § 23(a) (1) (A).

arriving at the intent of the parties,[10] but there is no legal basis here for holding, as the tax court in effect did, that such factors and circumstances can make a new agreement for the parties. The Tax Court fell into fundamental error by taking these circumstances and molding them to form this new agreement by reasoning that since "this is what happened, this is what the parties intended to happen." It simply does not follow that because Western ultimately acquired all 93 pieces of equipment, it therefore had the *legal right* to so acquire them. Such reasoning is contrary to all rules of law. An interpretation of a contract cannot be stretched to that length.

There being no evidence that this right existed at any time prior to actual purchase, we can find no basis in law for a finding that Western was acquiring an equity in the property, within the meaning of § 23(a) (1) (A). In the absence of such legal right, this case is readily distinguishable from those cases relied upon by the Tax Court, see note 10, supra, and the holding in Estate of Delano T. Starr, 30 T.C. 856, depended entirely upon factual circumstances not present here. The situation here is more analogous to Fishing Tackle Products Co., 27 T.C. 638, see note 9, supra; Abramson v. United States, D.C.S.D.Iowa, 133 F.Supp. 677 (absence of option, no evidence of any right or equity prior to

actual purchase—cannot take current relationship and relate it back to time contracts were made); Burnet v. Hutchinson Coal Co., 4 Cir., 64 F.2d 275, certiorari denied 290 U.S. 652, 54 S.Ct. 69, 78 L.Ed. 565. In the latter case, the contracts involved required certain minimum royalty payments, regardless of actual tonnage mined, with a provision that any royalties paid on tonnage not actually mined could be offset against royalty payments in future years. Holding in effect that the overpayments created no vested right in the unmined coal, and hence were properly deductible as rentals paid, the court observed, at page 278 of 64 F.2d:

> "Once paid that part of the minimum royalty not represented by coal actually mined can never be recovered *except in the exercise of a vague and indefinite future right* to mine the coal without payment of royalties. Recovery under these conditions is too vague and indefinite to be considered in deciding questions of taxation." (Emphasis added.)

The Tax Court's conclusion that Western was acquiring an equity in the equipment was clearly erroneous. The rental deductions should have been allowed.

The decision of the Tax Court is

Reversed.

10. It is clear that such considerations are material in construing leases containing options inasmuch as payments made thereunder obviously have a dual potential. Not *every* lease containing an option to purchase may be held primarily a sales contract. The decision ultimately depends on the intent of the parties and is governed to a large extent by the particular facts in each case. See and compare —Jefferson Gas Coal Co. v. Commissioner of Internal Revenue, 3 Cir., 52 F.2d 120; Burnet v. Hutchinson Coal Co., 4 Cir., 64 F.2d 275, certiorari denied 290 U.S. 652, 54 S.Ct. 69, 78 L.Ed. 565; Burroughs Adding Mach. Co. v. Bogdon, 8 Cir., 9 F.2d 54; Chicago Stoker Corporation, 14 T.C. 441; Truman Bowen, 12 T.C. 446; In re Rainey, D.C.D.Maryland, 31 F.2d 197; Holeproof Hosiery Co., 11 B.T.A. 547; Beus v. Commissioner of Internal Revenue, 9 Cir., 261 F.2d 176;

Goldfields of America, Ltd., 44 B.T.A. 200; Breece Veneer & Panel Co. v. Commissioner of Internal Revenue, 7 Cir., 232 F.2d 319; Benton v. Commissioner of Internal Revenue, 5 Cir., 197 F.2d 745; Earl L. Lester, 32 T.C. 60.

The 5th Circuit has ruled that a mere mechanical application of economic factors is erroneous in that *other* circumstances bearing on the intent of the parties should be considered. Furthermore, these factors must not be considered retrospectively—determination is to be made "in the light of facts and circumstances as they existed at the time the parties entered into the contract." Benton v. Commissioner of Internal Revenue, supra, 197 F.2d 745, 752. See also, Breece Veneer & Panel Co. v. Commissioner of Internal Revenue, supra, 232 F.2d 319, 322.